## PELZ et al. v. UNITED STATES.
### No. 227.

Circuit Court of Appeals, Second Circuit.

Jan. 4, 1932.

M. B. & D. W. Blumenthal, of New York City (Theodore Kiendl and Otho S. Bowling, both of New York City, of counsel), for appellant Pelz.

Walter H. Pollak and Carl S. Stern, both of New York City, for appellant Greenstein.

George Z. Medalie, U. S. Atty., of New York City (Samuel C. Coleman, Asst. U.

S. Atty., of New York City, of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The indictment charged appellants in nine substantive counts of violation of the mail fraud statutes (section 215 U. S. Criminal Code, 18 USCA § 338), and in the tenth count with conspiracy to violate the statute (section 37 U. S. Criminal Code, 18 USCA § 88). They were acquitted on the substantive counts and convicted on the conspiracy count.

Pelz-Greenstein Company, Inc., was a New York corporation, and the appellants were its officers. The name was changed to the Consolidated Factors' Corporation. The crime of conspiracy, of which appellants have been convicted, rests upon misrepresentations that they intended to list stock of the corporation, which they offered for sale to the public, on the New York Curb Exchange, and also that they made misrepresentations as to the financial condition of the corporation. The tenth count named as victims persons who were induced to purchase stock of the corporation.

The corporation was formed in 1922. It financed other concerns, in its factoring business, as departments. This relationship was created by a factoring agreement; money was advanced to a department against an account receivable. If a sale was made by the department and approved by Pelz-Greenstein Company, Inc., and credit risk assumed by it, then a new account receivable was created against the customer of the department, and the accounts receivable against the department were credited in the amount thus charged against the customer. The security for the loan was the inventory of that department, and sometimes other collateral was received; in some cases, if the departments were corporations, personal guaranties were given. At times credit insurance was taken out as a protection. If a customer's account receivable proved uncollectable, it was charged back to the department. All moneys advanced by the corporation were thus represented either in the accounts receivable in the department, or in accounts receivable of the customers of the department.

The corporation had a capital and surplus of $500,000 in 1922 and $2,000,000 in 1927. Sales financed in 1922 were about $550,000; in 1927, $12,500,000; and over $14,000,000 in 1928—the volume increasing each year. It had bank credits in some sixteen banks of $3,600,000 in 1928, and $4,000,000 in 1929. The corporation started in 1922 with a capital of 500,000 shares of preferred stock, and common stock of no par value. In 1923, the preferred stock was increased to $750,000, and in June, 1928, to $2,000,000. The indictment sets forth June 4, 1928, as the important date. On that date there was a stockholders' meeting which authorized the increase of the common stock from 21,000 to 135,000 no par value shares. There was outstanding at the time 20,000 preferred shares. The stockholders were given the right to exchange one share of preferred for three of common, and it appears that stockholders holding some $900,000 of this stock exercised their right and converted their shares. The common stock after June 4, 1928, was divided into 250 shares of class B, and 134,750 shares of class A stock. Class B stock, owned by appellants, held all the voting rights, but on July 1, 1929, all the common stock received voting rights. The corporation's books were audited by a well and favorably known firm of accountants. They were unhindered in their work, and in every way had a free hand.

The conspiracy count states that the conspiracy began June 4, 1928, and continued to August 29, 1930, which is the date of the filing of the indictment. It was arranged to sell stock to the public around September 1, 1928, through a firm organized for that purpose. It offered to the public 59,000 shares of stock. The first prospectus was dated October 2, 1928, and a later one November 28, 1928. The stock selling ended in June, 1929. Bankruptcy of the corporation followed in April, 1930.

The fraudulent scheme is charged to have been devised in June, 1928, and is based on the alleged false statements of the financial condition of the company as set forth on December 31, 1928. An alleged fraudulent representation, emphasized upon the trial, was that the appellants represented that application would be made to list the stock of the corporation on the New York Curb Exchange and that this was not done. While the corporation was carrying on business, it earned and paid 7 per cent. dividends on its preferred stock. Misrepresentation as to the assets and liabilities of the corporation are stated to have been made in its December 31, 1928, statement. It showed assets of the value of $7,913,465.25, liabilities of $4,734,311.16, and a net worth of

$3,179,154.09. The charge is that fictitious invoices were used in connection with the accounts of the Madison Distributing Company and its affiliates; also in connection with the account of E. Heller & Bro.; that the reassignments of handkerchief accounts and handkerchief inventories were false; that a series of notes, referred to as the Oppenheimer notes, executed as payable monthly to the corporation, was fraudulent. These are charged to have fraudulently increased the assets of the corporation as well as the net worth. As to the Madison Distributing Company and its affiliates,. the claim is that appellant Pelz made arrangements with the Madison Distributing Company, which was one of the departments of the corporation, to show $215,000 worth of sales by that company and its affiliates which were never actually effected. It may well be questioned how this affected the assets of the corporation by the issuance of false invoices through one of its departments. If fraudulently issued, the effect of such a transaction would be temporarily to reduce the amount due from the Madison Distributing Company by the amount of the fictitious sales, to substitute a new account for the same amount, and ultimately to reinstate the exact amount in the Madison Distributing Company account, under its assumption of the risk, but the total of accounts receivable could not have been affected one way or another, and could not have affected the statement of assets appearing on the balance sheet of December 31, 1928.

The E. Heller & Bro. account was another department of the corporation. It was testified that late in December, 1928, appellant Pelz requested that he be furnished with false invoices for approximately $300,000, which was done. When the invoices became due, in accordance with the arrangements, it was claimed that appellant Pelz paid them with checks obtained from his friends, and reimbursed his friends with funds obtained from the corporation. Assuming this to be true, and that the motive to create fictitious sales existed, the outstanding accounts on the books of the corporation were not increased or decreased by the transaction. The assets would remain the same. The Madison Distributing Company and its affiliates, the Blondel Textile Mills and the Bernice Silk Corporation, delivered inventories to the corporation. It was testified that these inventories were fraudulently increased by the companies at the request of the appellant Pelz, but only after protest-

ing and consulting with counsel, as in the case of the fictitious invoices. But the entries in the books indicated the indebtedness of the factored company to the corporation, and the account remained the same irrespective of the inventory. And the court charged: "I charge you that the procuring of false inventories by the defendants would not tend either to diminish or increase the gross assets of the corporation, nor would they affect in any way the balance sheet of the corporation, and that the gross assets of the corporation would be the same after the receipt of such false inventories as they were before."

And further: "Gentlemen, the false inventories would be a statement of what the department had in stock and it would not affect the statement as to the assets and liabilities of the corporation."

The inventories did not affect the balance sheet. The accountants, in preparing their statement, undoubtedly considered them in determining the amount of reserve to be set up, but the court instructed that inventories of debtors would not affect the balance sheet. That was the law of the case, and it appears that reasonable allowances were set up against commission accounts, and the statement shows "Receivables and Advances to Factored Accounts $5,463,902.-65." Assuming some larger reserve except for the inventories, the total sum as given would not have been materially reduced. The proof does not show that this manipulation of inventories was done with intent to defraud the buyers of shares. Of course, if it was done for the purpose of affecting the balance sheet so that the judgment of prospective purchasers would be influenced, that would be a misrepresentation, but we think it fails as such because it does not show that the balance sheet would have been affected materially, as the court charged, nor that appellant Pelz directed that it be done for that purpose. It was testified that the appellant Pelz requested and obtained in January, 1929, an increase of inventory as to E. Heller & Bro. accounts as of December 31, 1928. By the same reasoning, in view of the court's charge, this transaction is like the preceding one.

The Lincoln-Potter Company, Standard Handkerchief Company, and G. W. Sterling Company were in the handkerchief business. They all operated from the same address and were controlled by the same interest. It was testified that appellant Pelz requested that they prepare new assignments to the Pelz-

Greenstein corporation of all outstanding accounts of these concerns. Some of these accounts were old. There was no proof that the accounts were uncollectable, and the court so charged the jury. These reassignments of the old accounts were what they had already held as security, and neither affected the account nor the security. It did not change the balance sheet. But it was testified that the appellant Pelz instructed the representative of these firms to prepare an inventory showing an increase to the extent he directed. It was explained by Pelz, and apparently was uncontradicted, that this increase was requested because of additional goods located in the warehouse in New York City.

On December 31, 1928, one Oppenheimer executed a series of twelve notes for $5,500 each, payable monthly to the corporation, and he testified that as the notes became due he telephoned to appellant Pelz and was instructed to requisition money in behalf of one of his companies, transfer the money to his own account, and pay the notes. Another version of this transaction given by appellant Pelz was that the notes were delivered six months before the stock-selling campaign was launched, and there is no evidence that it was done in contemplation of such sale. His corporation, the Madison Textile Company, was indebted to Pelz-Greenstein Company, Inc., and Oppenheimer had guaranteed the indebtedness. Thus the creditor took notes from the guarantor, and when they became due the guarantor was permitted to draw on the credit of his principal to meet them. The effect of this transaction in anticipation, or in aid, of a stock-selling campaign, is very unimportant.

Misrepresentation is said to have been made by the statement that the corporation was conservatively and capably managed, and that all assets were liquid and maintained in cash and current receivables. These were statements made in the prospectus sent out to prospective purchasers. There was no fraud in these statements. The company was a going concern and maintained an established business. Its growth and success during its existence were justification for these statements.

The A. J. Roberts Company was a stock-selling agency. It was testified that it subscribed to 5,000 shares, the amount of stock that Roberts Company expected to sell during the next 60 days, and paid $1 a share on account. The subscription contained a clause which it is argued would release that

company from taking the 5,000 shares. The item was set up in the statement of December 31, 1928, as stock subscribed for. Under the circumstances, such statement might well have been made in good faith; it was not false nor was it grounded upon fraud or intent to defraud.

In the prospectus used in the sale of the stock, the following appeared: "Application will be made to list this common stock of the company on the New York Curb Exchange." This was used beginning June 4, 1928. After the completion of the main charge, at the request of trial counsel for the government, the court charged: "If you find that the defendants did not intend to apply to the New York Curb Exchange for the listing of the common stock within a reasonable time after June 4, 1928, you must find the defendants guilty. What is a reasonable time must, of course, be determined by you after a consideration of all the facts and circumstances in the case." To which exception was taken and error has been assigned. The court had theretofore charged: "With reference to the facts such as intention to list the stock on the Exchange, if at the time of making the statements they really did have such intention, there would not be anything false or fraudulent about it; but if they said they would list the stock and that they would do it within a reasonable time, intending not to do it or not to do it within a reasonable time, that would be a fraud and would be some evidence to authorize you to find that there was a scheme to defraud—to say that they would list it or do some act in the future if at the time they did not intend to do that act."

With the proof as we have referred to it, this charge directed the jury to find a verdict of guilty if the listing was not applied for within a reasonable time after June 4, 1928. In the main charge as quoted, the jury were properly instructed that a statement that they would list the stock within a reasonable time when they did not intend to list or to list within a reasonable time, was some evidence of a scheme to defraud, but when, at the request of appellee's counsel, there was a peremptory instruction that in such event the verdict must be guilty, harmful error was committed. The appellants offered reasons for delaying the application to list the stock on the New York Curb Exchange at the trial. Application was made July 29, 1929. The excuses were that a proposal to merge the corporation

with a competitor had been taken up, and counsel advised the appellants that no action in connection with the listing should take place until the completion of the proposed merger. In March, 1929, there was submitted to the Curb Exchange a plan of capitalization of the contemplated merged corporations. A change was suggested as to the voting rights of the preferred stock; otherwise it was approved. The negotiation for the merger failed in April, 1929, but counsel testified that another merger was proposed, and in May, 1929, application forms for listing on the curb were procured, but the actual filing was delayed because of the necessary time required for the discussion and effort to consummate the merger. The application was filed in October, 1929, and correspondence between the Exchange and the corporation ensued. It was not listed before the appellants were compelled to resign from the corporation.

 The essence of the crime of conspiracy to use the mails to defraud is grounded upon wrongful intent. McDonald v. U. S., 241 F. 793 (C. C. A. 6); Farmer v. U. S., 223 F. 903 (C. C. A. 2). The inquiry necessarily is, What was the actual intent of the appellants and the reasonableness of their plan, and what they did in consummation of it; all matters which measured their criminal responsibility. It was for the jury to answer. Durland v. U. S., 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709; Rudd v. U. S., 173 F. 912 (C. C. A. 8); Shaddy v. U. S., 30 F.(2d) 340 (C. C. A. 8). The charge made the conclusion of guilt flow inevitably from a failure to fulfill the promise "within a reasonable time." If the appellants failed to list, the charge directed the jury to convict on the conspiracy count. The evidence should have convinced that the appellants did something other than participate in the offense which is the object of the conspiracy. There must be proof of an unlawful agreement and participation therein with knowledge of the agreement. The error of the charge affected substantial rights. It is not a mere formality which may be overlooked. United States v. River Rouge Co., 269 U. S. 411, 46 S. Ct. 144, 70 L. Ed. 339. It was the last word from the court to the jury to guide them. The jury acquitted on all counts submitted to them except conspiracy. While the conspiracy count contained accusations of false representations concerning the financial condition of the company, it also contained a representation as to the listing which was not contained in the other charges of the indictment. And this representation the court, by the instruction, singled out, and apparently it had its effect in bringing about the conviction. It left nothing to the jury regarding the truth or falsity of their representations or whether or not it was a misrepresentation. The failure alone to act within a reasonable time, the court said, spelled guilt, and directed a verdict accordingly. The purpose and effect of the preparation of fictitious records and sales or assets seems to have been eliminated by this request. Indeed, the charge eliminated the essence of the conspiracy charged at the trial, namely, the scheme or artifice to defraud. Not every representation constitutes a scheme to defraud. The issue is not whether any statement is false or true, but whether the scheme as a whole is to defraud. McLendon v. U. S., 2 F.(2d) 660 (C. C. A. 6); Faulkner v. U. S., 157 F. 840 (C. C. A. 5). Criminality is established only when the false representation or pretense is the operating cause and basis of the conspiracy. It then violates the statute. The charge as given, at the request of counsel for the government, was so prejudicial that it requires a reversal of the judgment of conviction.

Judgment reversed.