**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jack E. BRONSTON,**
**Defendant-Appellant.**

**No. 1291, Docket 81–1015.**

United States Court of Appeals,
Second Circuit.

Argued April 27, 1981.

Decided Aug. 19, 1981.

As Amended Sept. 29, 1981.

Louis Nizer, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for defendant-appellant.

Pamela Rogers Chepiga, Asst. U. S. Atty., New York City (William M. Tendy, Chief Asst. U. S. Atty., Patricia M. Hynes, Mary

Jo White, Asst. U. S. Attys., New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

Jack E. Bronston appeals from a judgment of the Southern District of New York entered after a jury trial before Judge Milton Pollack, convicting him of two counts of mail fraud, 18 U.S.C. § 1341,[1] based on the government's allegations that he fraudulently violated his fiduciary duty as an attorney by helping to further the efforts of Convenience and Safety Corporation ("C & S") and Saul Steinberg, chairman of C & S, to obtain a bus stop shelter franchise from the City of New York at the same time when the law firm in which he was a partner, Rosenman, Colin, Freund, Lewis & Cohen ("Rosenman Colin"), was representing a group of investors in BusTop Shelters, Inc. ("BusTop"), the then current holder of the franchise and a participant in the competition for its renewal. We affirm. The evidence was sufficient to allow the jury to convict Bronston of mail fraud based on his breach of his duty of loyalty to his firm's clients, his concealment from the clients of his promotion to their harm of the interests of Steinberg and C & S in obtaining the franchise, his specific intent thereby to defraud his firm's client of the very economic value his firm had been retained to protect, and his mailing of two letters in furtherance of the fraudulent scheme.

On May 8, 1975, BusTop obtained an interim franchise from the City of New York to build and maintain shelters at bus stops over a three-year period. In the spring of 1977, as the end of the interim franchise was drawing near, BusTop began seeking outside capital with which it could expand its business and improve its chances of persuading the City that a 20-year renewal of its franchise was in order. After extensive negotiations, two venture capital companies, Citicorp Venture Capital Limited (a subsidiary of Citicorp) and Fifty-Third Street Ventures, Inc. (collectively "the investors" or "the minority investors"), tentatively agreed to make a substantial investment in BusTop. On June 1, 1977, the investors contacted Samuel ("Sandy") Lindenbaum, a partner in the Rosenman Colin firm, and retained the firm to advise them in making the investment.

At approximately the same time Jack Bronston, who was then a partner in the Rosenman Colin firm and a state senator from Queens, learned that his friend and client, Saul Steinberg, was also interested in retaining Rosenman Colin to assist him in his efforts to obtain the bus stop shelter franchise. Acting on Steinberg's behalf, Bronston met with Lindenbaum on May 17, 1977, to tell him that Steinberg wanted to retain Rosenman Colin to represent him in his bus stop shelter endeavors, and that he wanted Lindenbaum to appear on his behalf before the Board of Estimate. Lindenbaum immediately declined to undertake the representation, however, because, although BusTop was not itself a client of Rosenman Colin (and the representation of the minority investors had not yet begun), Lindenbaum did not feel he could work against BusTop, in view of his personal friendships with BusTop's public relations consultant and attorney. Despite this reaction from

---

1. Title 18 U.S.C. § 1341 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

Lindenbaum, Bronston went ahead on Steinberg's behalf and had a Rosenman Colin associate set up a Delaware corporate shell under the name of "Convenience and Safety Corporation," which would serve as Steinberg's vehicle in the bus stop shelter competition. C & S was incorporated on June 2, 1977.

On June 9, 1977, Bronston, by this time aware that Rosenman Colin had been retained as counsel by the BusTop investors, wrote a memorandum to his firm's new business committee, suggesting that the firm take on the representation of C & S

"which will serve as an investment vehicle for the erection of public bus shelters in New York City, Philadelphia, Chicago and Seattle. This may involve conflict with other clients of the office and should be discussed."

Murray Cohen, a member of the committee, was the first to receive Bronston's memo, and immediately returned it to him with the notation: "We should not do anything further on this until Sandy [Lindenbaum], you and I talk about it. There is a definite conflict." At trial, Cohen testified that at a subsequent meeting with Bronston and Lindenbaum he told Bronston that the firm could not represent C & S because its interests were "inimical" to those of the investors in BusTop. The situation was described by Cohen:

"The investors were proposing to invest, over a period of time, $1,300,000 in Bus-Top and obviously were counting on Bus-Top obtaining a renewal of its franchise, and Convenience and Safety was going to be a competitor of BusTop for that franchise and, therefore, if we were success-

ful on behalf of Convenience and Safety, we would have jeopardized the financial investment of the investors in BusTop."

Despite this clear response from Cohen rejecting his proposal that the firm accept the C & S representation, Bronston went back to Cohen on July 5, and proposed that he authorize the establishment of a client billing number for C & S "just in case at some time in the future something developed in which there was not a conflict." Cohen acceded to Bronston's request, but expressly instructed him that no work was to be performed on behalf of C & S without his prior approval. The memorandum written by Bronston to the firm's bookkeeper makes it clear that Bronston understood the very limited nature of Cohen's acquiescence:

"This new matter memorandum has been approved by Murray Cohen subject to the understanding that no further work will be performed on this matter without his explicit consent."

In August, 1977, representation of C & S's effort to acquire the New York City franchise was transferred to the law firm of Stein Rosen & Ohrenstein.[2]

Thus, no later than June 9, 1977, the Rosenman Colin firm had made the decision to represent the BusTop investors rather than C & S in the competition for New York City's bus stop shelter franchise, and this decision had been authoritatively communicated to Jack Bronston. For the next two months Rosenman Colin attorneys labored on behalf of the minority investors in negotiating the exact terms of their participation in BusTop. The initial agreement memorializing this participation was signed

---

**2.** On December 7, 1977, Cohen received a memorandum from Bronston urging the firm to accept the C & S account on a nationwide basis, on Bronston's representation that no conflict with BusTop would exist outside of New York City. Cohen's response was to assign an associate to research the question of whether, if BusTop were not seeking shelter franchises outside New York, it would be proper for Rosenman Colin to accept the C & S account on a non-New York basis. Before this question could be resolved, however, Cohen learned in mid-January 1978 from Howard Schneider, another Rosenman Colin partner, that BusTop

was in fact seeking franchises outside New York. Cohen thereupon instructed Bronston that no representation of C & S would be permitted anywhere in the country. (Cohen did, however, allow Bronston to complete a small project for C & S in New Jersey, which Bronston had undertaken pending a decision from Cohen on his request for approval to undertake the C & S nationwide representation and which was too far advanced to be transferred to another firm.) On January 25, 1978, Bronston wrote Steinberg to inform him of Rosenman Colin's decision to decline the C & S representation.

in the Rosenman Colin offices on August 16, 1977. The agreement provided that the minority investors would make their investment in several stages. The first stage called for the investors to purchase $300,000 worth of secured BusTop notes, which would be converted into stock when and if certain conditions were met, the most important of which was BusTop's obtaining a renewal of the franchise. In later stages, additional investments totaling $1,050,055 would be made. At the time this initial agreement was signed, the parties expected that the Rosenman Colin firm would continue to represent the investors after the signing. Howard Schneider, the Rosenman Colin partner most deeply involved in the investors representation, described the arrangement at trial:

> "the clear contemplation of the agreements and of the parties was that there would be a continuation of representation of the investors for the consummation of the transactions that were contemplated by the first financing agreement."

At no time relevant to the indictment in this case did the minority investors cancel the Rosenman Colin representation.

At the same time when these efforts were being made by Rosenman Colin lawyers on behalf of the BusTop investors, Bronston was secretly continuing his relationship with C & S. At the first meeting of C & S's board of directors, on June 17, 1977, Bronston was elected to a one-year term as the corporation's assistant secretary. On 15 separate occasions between August 25, 1977, and February 6, 1978, Bronston met with Steinberg and later filled out time tickets at his law firm indicating that the time spent was billable to C & S.[3] Bronston's time tickets reflected an additional half dozen meetings with other C & S officials during this same period, with the time recorded as billable to C & S.

Despite the fact that the legal representation of C & S's efforts to obtain the New York City franchise was formally transfer-

red to Stein Rosen & Ohrenstein in August, 1977, Bronston continued thereafter to attend meetings at which C & S business in New York was discussed, and was kept informed about the progress of the C & S bid. Important internal documents dealing with the New York bid prepared by C & S or by lawyers for Stein Rosen were routinely sent to Bronston, occasionally by messenger. Finally, the billing records of David Simpson, the Stein Rosen partner principally responsible for the C & S account, indicated that on at least six occasions between December, 1977, and June, 1978, Bronston participated in conference calls or meetings which Simpson billed to C & S.

There was also evidence that, during the period when Bronston was secretly working in the interests of C & S against those of BusTop and his firm's clients, Lindenbaum was meeting with the clients (Venture Capital and Fifty-Third Street Ventures), was actively engaged in negotiating their agreement to invest in BusTop, was unaware of Bronston's activities on behalf of C & S, and was conferring with Bronston with respect to the clients' investment in BusTop. These conferences were billed by Lindenbaum to the clients. At the same time Bronston made out tickets to bill C & S for time spent in discussing with Steinberg Bronston's conversations with Lindenbaum. Billing records reveal that some of these Lindenbaum-Bronston meetings which were followed by Bronston-Steinberg conferences occurred at points of critical importance to the clients and to C & S in pursuing their competing and conflicting interests. For instance, on October 21, 1977, the day after the New York City Board of Estimate was to consider BusTop's application for the bus stop franchise, Lindenbaum and Bronston had a one-hour breakfast discussion which Lindenbaum billed to the BusTop investors as clients. Three hours later Bronston had a 2½-hour meeting with Steinberg and others which he noted for billing to C & S. His firm's clients, the BusTop investors, were not informed of his activities on behalf of C & S in conflict with their interests.

---

3. At no time was any bill based on these time tickets sent to C & S. This may have been due to the fact that under firm billing procedures

Bronston could not bill C & S directly, since all bills were screened by the firm's billing committee prior to transmittal.

The indictment against Bronston charged him with two counts of mail fraud, growing out of the sending of two letters allegedly intended to increase C & S's chances of wresting the New York bus stop shelter franchise from BusTop. The first count involved a letter sent by Stein Rosen on C & S's behalf to the members of the New York City Board of Estimate. The letter was prepared after Bronston had met with Steinberg and Samuel Stein of Stein Rosen on August 25, 1977. It was decided at that meeting that a letter should be sent to the Board publicly announcing C & S's interest in presenting to the City a plan for building and operating bus stop shelters, and introducing Stein Rosen as counsel for C & S. The letter was drafted by Stein Rosen lawyers, but before it was sent a copy of the draft was hand-delivered to Steinberg for review. Steinberg went over the letter with Bronston, and Bronston then telephoned Stein at Stein Rosen to let him know that he thought it was a good letter. Bronston then noted to bill C & S for five hours of services on August 25, specifically including his "review of letter with Saul Steinberg." He also noted an additional half hour spent on C & S business on August 26 for his telephone conference with "Sam Stein re letter." When the City subsequently responded to the August 26 letter, Bronston participated in a meeting with Steinberg and Stein to evaluate the response, and filled out a time ticket in the name of C & S for the time spent.

The second count grew out of a letter which Bronston himself drafted and sent on his official New York State Senate stationery to Richard Wells, Executive Assistant to New York City Comptroller Goldin, on October 28, 1977. In relevant part, the letter read as follows:

"I enclose some figures in connection with the existing franchise which I am sure you have, but which I would like to reiterate. Obviously, a renewal of the existing franchise would not appear to be in the public interest since it might be taken for a reward for non-performance."

The enclosure consisted of a one-page summary of the status of BusTop's performance under the interim franchise, emphasizing BusTop's failure to comply with the terms of the agreement. The final paragraph read as follows:

"Based upon the anticipated program of building approximately 4,000 shelters (including purchase from the City of the approximately 400 shelters built to date by BusTop Shelters, Inc.) and assuming payment to the City of between 14–16% of gross advertising revenues, the City would receive in excess of $2 million per annum at the conclusion of such construction program."

This letter was a retyped version of an October 27, 1977, memorandum from Henry Silverman, President of C & S, to Sidney Baron, C & S's public relations consultant, which had been changed in minor respects by Bronston to eliminate any reference to C & S, as the following pertinent portion of the C & S memorandum (with changed portions underlined) shows:

"Based upon *our* anticipated program of building approximately 4,000 shelters (including *our* purchase from the City of the approximately 400 shelters built to date by BusTop Shelters, Inc.) and assuming payment to the City of between 14–16% of gross advertising revenues, *we believe that* the City would receive *from our operations* in excess of $2 million per annum at the conclusion of *our* construction program."

The letter was typed on Bronston's official Senate stationery by his Rosenman Colin secretary and was mailed by her with the enclosure. Bronston then noted to bill C & S for a "letter to Richard Wells."

For its services to the BusTop investors Rosenman Colin billed approximately $52,-000, which the investors paid without being aware that Bronston had been working for Steinberg and C & S and against their interests. In addition, there was evidence at trial from which the jury could have inferred that Bronston was paid $12,500 by Steinberg for his efforts on behalf of C & S. On December 9, 1977, Bronston wrote to Steinberg, detailing his time charges to

date and indicating that he would not ask for payment "until you and your partners decide on a format through which this can be done." On June 28, 1978, Bronston received a personal check from Steinberg (which was never recorded on C & S's books) for $12,500, the precise amount which Bronston had previously estimated to Rosenman Colin as the retainer that would be forthcoming in 1978 if the C & S representation were accepted.[4]

Prior to trial Bronston moved to dismiss the indictment on the ground that it failed to allege that Bronston utilized or took advantage of his fiduciary position in order to effectuate the fraud charged. In response, the government argued in the alternative that: (a) proof of misuse of the defendant's fiduciary position to effectuate the fraud is not a necessary element of a mail fraud prosecution; and (b) even if it is, the government will prove at trial "that Bronston *did* use his fiduciary position to advise C & S and to promote the interests of C & S, in opposition to those of BusTop and the minority investors" (emphasis in original). The district court denied Bronston's motion. Without deciding the issue of law posed by Bronston, the court held that the indictment adequately set forth the elements of the offense intended to be charged. 491 F.Supp. 593, 594 (S.D.N.Y.1980). At the conclusion of trial, counsel for Bronston proposed the following charge,

> "in order to find a scheme to defraud, the prosecution must establish beyond a reasonable doubt that Mr. Bronston *used* the fiduciary position he held on behalf of the minority investors to further the interests of Convenience and Safety" (emphasis in original),

which Judge Pollack declined to give.

## DISCUSSION

Bronston's principal contention is that in order to show a violation of the mail fraud statute based on a fraudulent breach of fiduciary duty, the government must prove that the defendant used his breach in some way that would benefit himself or harm the victim of the fraud and that the trial judge erred in failing to instruct the jury accordingly. Under this test, Bronston argues, the conviction must be reversed since the evidence was insufficient to permit the jury to find that he used his fiduciary status as a partner of Rosenman Colin to benefit himself or C & S at the expense of the BusTop investors. We disagree.

■ Although a mere breach of fiduciary duty, standing alone, may not necessarily constitute a mail fraud, *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Rabbitt*, 583 F.2d 1014, 1024 (8th Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Bush*, 522 F.2d 641, 648 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976), the concealment by a fiduciary of material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other is a violation of the statute. *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980); *United States v. Bohonus*, 628 F.2d 1167 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Mandel, supra; United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). See generally Note, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions Under the Federal Mail Fraud Statute*, 47 U.Chi.L.Rev. 562 (1980). As we noted in *Von Barta, supra*, proof that the fiduciary relationship was used or manipulated in some way is not necessary.

**4.** Sometime between July 18 and 20, 1978, Bronston's letter to Richard Wells was uncovered by BusTop pursuant to a request under New York's Freedom of Information Law, which was served on the Comptroller's office.

At trial, defense counsel introduced in evidence a check from Bronston to Steinberg for $12,500 dated July 19, 1978, and marked "repayment of exchange."

"Thus to make out a mail fraud violation, the Government must show that the scheme was devised with the specific intent to defraud, e. g., *United States v. Keane*, 552 F.2d 534, 544 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). . . .

"To prove mail fraud, the prosecution must also demonstrate that the use of the mails in furtherance of the scheme was reasonably foreseeable, e. g., *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362, 98 L.Ed. 453 (1954). Furthermore, the deceit must have gone to the nature of the bargain, *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970); that is, any nondisclosures or affirmative misrepresentations must have been material, see, e. g., *United States v. Bush*, 522 F.2d 641, 647–48 (7th Cir. 1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v. Bryza*, 522 F.2d 414, 425–26 (7th Cir. 1975), *cert. denied*, 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). And although the Government need not show that the scheme's victims were in fact defrauded, *United States v. Andreadis*, 366 F.2d 423, 431 (2d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967), the prosecution must prove that some actual harm or injury was at least contemplated, *United States v. Dixon*, 536 F.2d 1388, 1399 n.11 (2d Cir. 1976); *United States v. Regent Office Supply Co., supra*, 421 F.2d at 1180.

\*    \*    \*    \*    \*    \*

"The additional element which frequently transforms a mere fiduciary breach into a criminal offense is a violation of the employee's duty to disclose material information to his employer." *United States v. Von Barta, supra*, 635 F.2d at 1005 n.24, 1006."

■ In the present case the indictment charged that Bronston, in disregard of the fiduciary duty he owed as a member of the Rosenman Colin firm to the BusTop investors and for the purpose of benefiting Steinberg and C & S to their detriment, promoted the interests of Steinberg and C & S in their efforts to obtain a bus shelter franchise from the City of New York and "did conceal from, and fail to disclose to, the BusTop minority investors and BusTop the fact that he was advising and promoting the interests of Steinberg and C & S." These allegations, coupled with the charge that Rosenman Colin received $50,-000 from BusTop for services to it, that Bronston received a check for $12,500 from Steinberg for promoting the interests of Steinberg and C & S with the intent of harming BusTop, and that Bronston caused two letters to be mailed in furtherance of the scheme, were sufficient to state a violation of the mail fraud statute.

■ Applying these standards, the evidence before the jury was sufficient to support a conviction for the alleged mail fraud. It is clear beyond doubt that as a member of the Rosenman Colin firm Bronston owed a fiduciary duty to its clients, the BusTop investors, and that in promoting the interests of Steinberg and C & S in competition and conflict with those of his firm's clients, Bronston violated that duty. DR5–105, Code of Professional Responsibility. See generally T. Morgan and R. Rotunda, *Professional Responsibility*, 53–58 (2d ed. 1981). Having retained the Rosenman Colin firm as their counsel, the BusTop investors were entitled to the undivided loyalty of its partners.

The element of specific intent to defraud was likewise established. There was ample evidence that Bronston, with knowledge that his law firm was representing investors who had entered into a long-term financial commitment to BusTop, which was dependent upon BusTop's success in securing renewal of its franchise, was secretly engaged, without disclosure to his firm's clients, in an ongoing and significant role in C & S's efforts to obtain the franchise for itself, which would cause serious harm to the clients. Despite his firm's explicit prohibition against any further involvement on behalf of C & S, he attended frequent meetings at which the C & S bid for the New York franchise was discussed. By filling

out time tickets showing C & S as the client whenever he attended such a meeting or engaged in other activities in connection with C & S, Bronston gave the jury ample ground for finding that he perceived himself as acting on behalf of C & S, even though he was professionally obligated to remain loyal to the interests of the BusTop investors.[5] See generally *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976). Finally, by writing an anti-BusTop letter to Richard Wells and by participating in the preparation of another letter to city officials in support of C & S's bid, Bronston was engaging in furthering the scheme to defraud BusTop and its investors.

The element of concealment of a material fact, necessary to prove the alleged scheme to defraud, was also established. At no time did Bronston reveal to the BusTop investors that he was working hand in glove with Steinberg and C & S to obtain the franchise for C & S to their detriment. The materiality of this fact is self-evident. This was no mere technical failure on a law firm's part to disclose all potential conflicts of interest to its clients. One can imagine few nondisclosures more crucial to an attorney-client relationship than the fact that the law firm which the client has retained is actively engaged in efforts designed to frustrate the precise endeavor which the client had engaged the firm to pursue.

The record is equally clear that the scheme to defraud BusTop and its investors of the bus stop shelter franchise was designed to inflict actual economic harm on the BusTop investors and was capable of doing so. Bronston disputes this statement, arguing that the BusTop investors were merely lenders who were protected by "perfect" security which would leave them unharmed even if C & S were to win the franchise. He also contends that the conditions specified in the August 16, 1977, agreement between the investors and BusTop made renewal of the BusTop franchise such a remote possibility that Bronston's efforts on behalf of C & S were irrelevant. We are unpersuaded.

There was sufficient evidence before the jury to support a finding that the minority investors' position after August 16, whether characterized as one of lender or equity investor, was sufficiently risky to give them an economic interest in the future of Bus-Top. While the initial moneys advanced to BusTop were technically in the nature of a loan which was collateralized by all of Bus-Top's tangible assets (principally the completed bus shelters), there was testimony at trial from Peter Gerry of Citicorp Venture Capital Limited that the validity of the lien thereby granted to the investors was in doubt because the terms of the interim franchise itself prohibited BusTop from granting liens on the shelters. Moreover, it was Gerry's testimony that the investors conceived of their participation in BusTop as more in the nature of an equity investment than a loan. They therefore considered the renewal of the franchise of central importance to the economic success of their participation in BusTop. The argument that the conditions imposed in the August 16 agreement were so unlikely to be met that there was no real chance that the investors would ever have been called upon

---

**5.** Bronston argues that, had he intended to conceal his C & S activities from his partners and the BusTop investors, he would never have filled out time tickets listing C & S as the client and then sent them to the firm's accounting office for registry on the firm's books. However, there is no evidence of any in-house mechanism which would have brought the time charges to the attention of anyone at Rosenman Colin who would have recognized their impropriety; in fact, they were only turned up after Bronston's activities on behalf of C & S had been uncovered through other means.

In any case we find Bronston's time ticket entries principally probative not of his intent to deceive his partners and the BusTop investors but rather of his state of mind as he met with Steinberg and associates during 1977 and 1978. By noting that his time would at some future time be billed to the C & S account, Bronston was declaring in a most graphic fashion that he conceived of his efforts on behalf of Steinberg and the others as being professional rather than social and as redounding to C & S's benefit. The fact that under the circumstances it may have been foolish for Bronston to have made the entries does not render them exculpatory.

to complete their investment and turn their notes into shares of BusTop stock is highly speculative and inherently unprovable. Surely it could not properly have served as a basis for taking the issue of economic harm away from the jury. In any event, as alleged in the indictment, Bronston, by means of his fraudulent conduct, benefited to the extent of receiving a check for $12,500 from Steinberg which was returned only after his fraudulent activities were discovered by his firm's clients, and, in addition to the prospective harm the clients faced from BusTop's potential loss of the franchise, they suffered actual loss to the extent of paying the Rosenman Colin firm as their counsel $52,000 for undivided loyalty which they did not receive. Moreover, although use or manipulation of Bronston's breach of fiduciary relationship was not a prerequisite to conviction, the proof that Bronston, immediately following a conference with Lindenbaum regarding their clients' investment in BusTop, discussed the conversation with Steinberg provided the basis for an inference that such activity occurred. The government was frustrated in eliciting any detail with respect to these conferences by Lindenbaum's rather strange inability to recall even the substance of what was discussed, and the refusal of Steinberg and Silverman (President of C & S), who apparently indicated they would invoke their Fifth Amendment privilege, to testify. Bronston, the central figure in both conversations, exercised his constitutional right not to take the stand in his own defense.

■ Finally, the evidence at trial was sufficient to support the jurisdictional predicate contained in the mail fraud statute that the defendant be found to have "place[d] in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service," in furtherance of his fraudulent scheme.[6] The letter which Bronston drafted and had sent to Richard Wells falls within the statutory language, as Bronston seems to concede. While it is true that Bronston's participation in the preparation and mailing of the letter to the members of the Board of Estimate was less active, it was sufficient under the cases to support conviction. See, e. g., *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 453 (1954); *United States v. Rabbitt, supra*, 583 F.2d at 1023; *United States v. Brown*, 540 F.2d 364, 376 (8th Cir. 1976). As one commentator has summarized the case law:

"A defendant is deemed to have 'caused' a mailing if he could reasonably have foreseen it .... The only [additional] requirements are that the mailing must not occur after the scheme has reached fruition, and the mailing must not conflict with the scheme." Morano, *The Mail-Fraud Statute: A Procrustean Bed*, 14 J.Mar.L.Rev. 45, 51–52 (1980)."

■ Bronston argues that a decision upholding his conviction "would render every disloyal or ethically questionable act which is accompanied by the mailing of a letter a crime." We disagree. Although a hypothetical can be posed in which one could be prosecuted for mail fraud on the basis of a breach of fiduciary duty accompanied by little more than a failure to disclose the breach to the person to whom the duty was owed, without any prospect of substantial economic harm to the victim, this is not such a case. Here we are faced with a straight-forward economic fraud in which the object of the scheme was not merely to deprive the victims of a law firm's undivid-

---

6. Bronston argues that count one of the indictment, which was based on the August 26, 1977, letter sent to the members of the Board of Estimate by Samuel Stein, must be dismissed because it had no material connection with the alleged scheme. We disagree. · The jury was justified in finding that this letter, which was intended to publicly announce C & S's interest in presenting a plan for building and maintaining bus stop shelters, was a material element of the overall scheme to deprive BusTop of the renewal of its franchise. At the time the letter was written, it was the understanding of C & S officials that "the relationship between the City of New York and BusTop Shelters, Inc. is being reviewed at this time." Since the August 26 letter was intended to prevent BusTop from obtaining a quick, unopposed renewal of its franchise, it was clearly material to the overall scheme.

930

ed loyalty, for which they paid $52,000, but to deprive BusTop and its minority investors of the BusTop franchise. A partner in a law firm used the mails with the specific intent of defrauding one of his firm's own clients of the precise interest which it had been retained to defend. This falls within the ambit of the mail fraud statute.

■■ We have examined Bronston's other claims of error and find them to be without merit. A reading of the trial transcript satisfies us that the district court's handling of the trial was fair and impartial. The jury was adequately charged that Bronston's good faith would be a complete defense and that the burden was on the government to prove lack of good faith beyond a reasonable doubt. The court properly excluded as irrelevant evidence of BusTop's non-performance of its bus shelter contract, which Bronston offered in support of his claim that he acted in good faith as a State Senator. The record is clear that Bronston did not disclose his officership in C & S or his relationship to it, under which he was to be paid for his services to C & S. Indeed, he received $12,500 from C & S's Chairman, Steinberg, which was repaid only after BusTop learned of Bronston's letter to Richard Wells, Executive Assistant to New York City Comptroller Goldin, urging non-renewal of the BusTop franchise. Since the evidence at trial did not provide support for the contention that Rosenman Colin's representation of the BusTop investors was as limited in scope as Bronston maintains, the failure to so charge was not erroneous.

■ Judge Pollack's questioning of witnesses was for the proper purposes of clarifying ambiguities, correcting misstatements, or obtaining information needed to make rulings, all of which were within his responsibilities as trial judge. See *United States v. Robinson*, 635 F.2d 981, 986 (2d Cir. 1980); *United States v. Lamont*, 565 F.2d 212, 220 (2d Cir. 1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978); *United States v. Bernstein*, 533 F.2d 775 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). He repeatedly advised the jury that he had no

views as to the evidence and that they were not to draw any inferences as to his views from any of his comments or statements. *United States v. Boatner*, 478 F.2d 737, 741–42 (2d Cir.), *cert. denied*, 414 U.S. 848, 94 S.Ct. 136, 38 L.Ed.2d 96 (1973).

■ The exclusion of Freund's testimony regarding the ethical propriety of Bronston's conduct in promoting the interests of C & S was proper. Unlike Lindenbaum and Schneider who, as fact witnesses, testified to discussions with Bronston back in January 1978 regarding the impropriety of his representing C & S, which were relevant to Bronston's state of mind, Freund had had no contemporaneous conversations or dealings with Bronston with respect to the matter and did not discuss it with him until after his conduct had been discovered by the BusTop investors, which obviously placed the Rosenman Colin firm in the embarrassing position of defending secret activities of a firm member, Bronston, which conflicted with the client's interests. Once Bronston's fraud had been exposed, although testimony by Freund as to Bronston's post factum self-serving declarations was inadmissible, Judge Pollack nevertheless permitted Bronston, who did not take the stand, to introduce a substantial amount of this self-serving hearsay through Freund. However, expert testimony by Freund regarding the ultimate question of whether Bronston's conduct amounted to a breach of fiduciary was clearly inadmissible. As a member of Bronston's own law firm Freund could hardly be labelled impartial. Moreover his testimony would in substance have conveyed nothing more to the jury than his "general belief as to how the case should be decided." *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 510 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). This was a matter within the jury's exclusive province.

The conviction is affirmed.

VAN GRAAFEILAND, Circuit Judge, dissenting:

Although I yield to no one in the strength of my conviction that lawyers should adhere

to the highest ethical standards, *see, e. g., Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976), I feel equally strongly that lawyers accused of crimes based on alleged unethical conduct are entitled to fair trials. Because of what I believe were prejudicial errors in the court below, I respectfully dissent.

The present mail fraud statute, 18 U.S.C. § 1341, is the successor to section 301 of the 1872 *Act to revise, consolidate and amend the Statutes relating to the Post-Office Department,* 17 Stat. 283, 323 (1872). While legislative history is sparse, what there is indicates that the statute was originally aimed at flimflam artists who use the mails to defraud the gullible. *Durland v. United States,* 161 U.S. 306, 314, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896); *United States v. Von Barta,* 635 F.2d 999, 1005 (2d Cir. 1980); Note, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions under the Federal Mail Fraud Statute,* 47 U.Chi.L. Rev. 562, 568 (1980). In contravention of the general rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity", *see United States v. Dixon,* 536 F.2d 1388, 1401 (2d Cir. 1976), *quoting Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), section 1341 has been broadly interpreted to apply to fiduciaries who use their position for personal pecuniary gain. *Dixon, supra,* 536 F.2d at 1399; *United States v. Buckner,* 108 F.2d 921 (2d Cir.), *cert. denied,* 309 U.S. 669, 60 S.Ct. 613, 84 L.Ed. 1016 (1940). Where liability has been found, however, it was inevitably because the fiduciary relationship enabled the defendant to commit the wrongful acts for which he was convicted.

Where, as here, liability is predicated upon the vicarious fiduciary responsibility of an individual lawyer in a large, modern-day law firm and there is no evidence that the defendant exploited the vicarious relationship for personal gain, the statute should be applied with careful attention to its basic purpose.

[T]o say that a man is a fiduciary only begins an analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge those obligations? And what are the consequences of his deviation from duty?

*SEC v. Chenery Corp.,* 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943).

Courts and commentators dealing with individual conflict of interest claims in today's colossal law firms have struggled to avoid unfair, mechanically applied rules formulated at a time when such law firms as existed were small in size. *See, e. g., Armstrong v. McAlpin,* 606 F.2d 28 (2d Cir. 1979), *vacated by en banc court,* 625 F.2d 433 (1980), vacated 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); Note, *The Chinese Wall Defense to Law-Firm Disqualification* 128 U.Pa.L.Rev. 677 (1980); Anderson, *Conflict of Interest* 52 Wash.L.Rev. 807 (1977); Note, *Unchanging Rules in Changing Times; The Canons of Ethics and Intra-Firm Conflicts of Interests,* 73 Yale L.J. 1058 (1964). Differences of opinion among knowledgeable persons are not uncommon. When a man's freedom is at stake, these differences of opinion should be fully explored. I believe that the defense was unduly and unfairly hampered in this respect by the questions, rulings, and instructions of the trial court.

This is not a case in which the defendant took advantage of or used his fiduciary relationship with firm clients to do them harm. Judge Mansfield's statement that there was sufficient evidence to support an inference of "use of or manipulation of Bronston's breach of fiduciary relationship" is completely without support in the record. The Government took the position at the outset of the trial that it was not required to prove that any confidential information was wrongfully utilized or leaked by Bronston, and the Goverment did not prove it. The Government did not even prove that there was information of a confidential nature that might have been wrongfully disclosed. Every witness who was queried on the matter testified that there was no misuse of confidential information. The prose-

cution did not say one word in support of this contention in summation, and the district court did not discuss it in its charge. Violation of 18 U.S.C. § 1341 could not be predicated upon misuse of confidential information; proof of other wrongful conduct was required.

The trial court told counsel and jurors on numerous occasions that whether or not there was a breach of ethics was not an issue in the case. I disagree. The essence of the crime of mail fraud is wrongful intent. *Pelz v. United States,* 54 F.2d 1001, 1005 (2d Cir. 1932). For there to have been a violation of the mail fraud statute, there must have been a "conscious knowing intent to defraud", *United States v. Kyle,* 257 F.2d 559, 564 (2d Cir. 1958), *cert. denied,* 358 U.S. 937, 79 S.Ct. 327, 3 L.Ed.2d 308 (1959), a conscious knowing violation of defendant's ethical fiduciary obligations. Evidence concerning the defendant's motives and his belief in the propriety of his conduct was material, because it might have tended to repel the inference of fraudulent intent. *Id.* at 563.

[S]ince [intent] may be only inferentially proven, 2 Wigmore on Evidence §§ 300, 302, 3d Ed. 1940, no events or actions which bear even remotely on its probability should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have.

*United States v. Brandt,* 196 F.2d 653, 657 (2d Cir. 1952).

Contrary to the district court's repeated assertions, the question whether defendant's conduct properly could be considered as conforming to the legal profession's Code of Professional Responsibility was squarely in the case as bearing upon the defendant's intent and good faith. This argument was made to the district court by defense counsel:

There is a third ground, and that is it would bear on the witness' state of mind and his intention. If in fact it is reasonable to believe that what he is charged with doing was not a violation of a professional ethics, then I think that is cer-

tainly relevant to the issue of good faith which your Honor has recognized as a vital issue in this case.

The expert testimony which defendant sought to introduce should have been admitted for this purpose. *United States v. Garvin,* 565 F.2d 519, 522–23 (8th Cir. 1977). The district court's summary rejection of this testimony with the comment "We are trying a case, not a breach of ethics," was prejudicial error.

After having stressed to the jury that the ethical propriety of defendant's conduct was not an issue in the case, the district court interjected itself into the questioning of one of the Government's witnesses, and the following colloquy occurred:

THE COURT: Now that the subject has been opened, I would like to know, as a member of the firm, was Mr. Bronston free to promote the mutually exclusive interests of a competitor of your client on the subject of the firm's engagement for the client?

MR. NIZER: I object to that, your Honor.

THE COURT: Overruled.

THE WITNESS: No, absolutely not.

THE COURT: Why not?

MR. NIZER: Objection, sir.

THE COURT: Well, I will leave it for the jury to answer the question why not. I sustain your objection.

MR. NIZER: And I object to that comment, your Honor, as if—I won't say further. I move to strike it out.

THE COURT: What comment?

MR. NIZER: That you leave it to the jury to answer that question, as if the implication on that—

THE COURT: What you have objected to I have sustained you on. That is not being left to the jury.

MR. NIZER: I see.

THE COURT: There is no further implication.

This questioning by the district court dealt either with a breach of legal ethics or with the alleged violation of section 1341. It could have had no other purpose. In

view of the trial judge's instructions that the jurors were not to be concerned with the question of ethics, they might well have concluded that the judge was pointing them to a clear statutory violation. If so, the judge's conduct was prejudiciously erroneous.

If, on the other hand, the question dealt solely with the ethics of defendant's conduct, it was part of an equally erroneous pattern. Although the judge permitted the prosecution to question several witnesses concerning the asserted unethical nature of defendant's conduct, he blocked defense counsel's efforts to prove the contrary. Having effectively stymied the defense on this issue, the judge charged the jury as a matter of law that "[a] lawyer such as the defendant Jack E. Bronston has a duty not to act in any manner which is inconsistent with a client's interest." Thereafter, the court charged:

> I already have explained to you the concept of a lawyer's duties, fiduciary duties to you. You may consider a knowing breach of such duties by the defendant Jack E. Bronston if you find that such a breach occurred as evidence of intent to defraud.

The district court's emasculation of the defense of good faith did not stop there. Although the court charged the jury that good faith on the part of the defendant in urging competitive bidding was a complete defense, other rulings and instructions by the court made this a meaningless sop for the defense. The defense contended that what my colleagues term a "quick, unopposed renewal" of the BusTop franchise was in fact a "rip-off" of the people of the City of New York. The letter from the defendant to the City Comptroller, which was the linchpin in the Government's case, stated that BusTop was in default under its short-term contract with the City, that BusTop had built less than half of the shelters it had agreed to build, and had erected almost none of them in the disadvantaged areas of the Bronx. After this agreement had been terminated, BusTop attempted to push through a "quick, unopposed" twenty-year renewal without any competitive bidding by other companies.

Are my colleagues now prepared to say that if the "quick, unopposed" renewal of BusTop's contract had taken place, the City would not have been ripped off? I doubt it. Should not the jury have been given all the facts so that it could have made a fair, even-handed determination whether the defendant, a State Senator representing the Borough of Queens, was acting in good faith in attempting to prevent a rip-off? The jury was not given all the facts. The district court prevented it.

Defendant's letter stated that BusTop was in default under its contract. The truth of falsity of this statement goes directly to the heart of the Government's claim of bad faith. Where lies the truth? The jury doesn't know, and neither do we. Questions dealing with the impropriety and harmful effects of BusTop's conduct were held not to be pertinent. After sustaining the Government's objections to defense questions aimed at developing the facts, the court charged the jury:

> You must keep your attention riveted on the issue on trial. We are trying the terms of the indictment, the accusation. We are not trying here the question of which competitor was entitled to a franchise or on what terms, nor are we trying whether Bus Top Shelters, Inc. was or was not in compliance with the original agreement with the City. Those are not the matters you are here to decide. Don't be sidetracked thereby.

I suggest that the truth or falsity of defendant's letter was not a "sidetrack" but was a fundamental issue in the case. If the defendant acted with an honest intent to accomplish a laudable object, there was no crime. *Durland v. United States, supra,* 161 U.S. 306, 313–14, 16 S.Ct. 508, 511, 40 L.Ed. 709.

Since the jury was required to weigh defendant's bona fides with only half of the facts before it, I cannot agree with my colleagues that defendant had a fair trial.

I would reverse.