**UNITED STATES of America,**

v.

**Kenneth LARSON, Defendant.**

**No. S 83 Cr. 246–CLB.**

United States District Court,
S.D. New York.

July 29, 1983.

U.S. Atty. Rudolph Giuliani by Asst. U.S. Atty. William J. Schwartz, New York City, for plaintiff.

Rappaport & Frost by Edward M. Rappaport, New York City, for defendant.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

On July 16, 1983 following a jury trial, defendant Kenneth Larson was found guilty of one count each of having conspired to and actually violating the Hobbs Act, 18 U.S.C. §§ 1951 and 1952, and three counts of having made false declarations before the grand jury in violation of 18 U.S.C. § 1623. His indictment and conviction arose out of the alleged receipt of illegal cash payment by members of the New York City Police Department. In this motion, fully submitted on July 18, 1983, defendant Larson moves as follows: (1) for a judgment of acquittal pursuant to Rule 29(c), F.R.Crim.P. on the ground that the evidence adduced at trial was insufficient to sustain a conviction; (2) for a new trial pursuant to Rule 33, F.R.Crim.P. on the ground that the prosecution willfully suppressed Brady material; and (3) to set aside the verdict or arrest the judgment pursuant to Rule 34, F.R.Crim.P. on the ground that the Court was without jurisdiction of the offenses charged. For the reasons set forth below, the motion is denied on each ground.

Viewed as it must be at this stage of the proceedings, most favorably to the Government, the evidence adduced at trial was sufficient to prove guilt beyond a reasonable doubt.

Insofar as concerns the Government witness, Thomas Peteroy, Jr., the jury was fully informed as to all of his state and federal criminality. It knew the full nature and extent of all of the deals that he had made with federal and state authorities. The jurors were able to assess his credibility. Defendant had a fair opportunity to argue to the jurors, and in fact did argue, that Peteroy was unworthy of belief. This Court gave the traditional jury instruction concerning accomplice testimony. The credibility of Peteroy has been resolved, as it must be, by the jury, and its resolution by the jury was in the Government's favor. There is no basis for this Court to revise or change that determination.

This Court does not believe that the taped conversation received in evidence was ambiguous. Indeed, the tone of voice and reactions by grunt, with which defendant responded to Peteroy's leading questions and comments were evocative of a consciousness of guilt and a guarded manner of speaking consistent with guilt. Interpretation of the tape, however, was also for the jury.

While the questions asked in the grand jury upon which the § 1623 counts were founded, were not well framed, they were sufficient to give notice to defendant and were understood by him. The proof at trial was overwhelming to the effect that defendant knowingly and willfully lied to the grand jury in answering the questions. His prior comments to Peteroy on tape indicated an advance intention to stonewall by telling the grand jurors "don't know nothing."

Defendant's contention that his criminal conduct was "never intended by the enactment of this kind of legislation," (Affidavit, p. 4), referring to the Hobbs Act, while an appealing argument, is foreclosed by prior authority in this Circuit. See *United States v. Margiotta,* 688 F.2d 108, 130–33 (2d Cir. 1982), *cert. denied* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Augello,* 451 F.2d 1167, 1169–70 (2d Cir.1971), *cert. denied* 405 U.S. 1070, 92 S.Ct. 1518, 31 L.Ed.2d 802 (1972); *cf. United States v. Barta,* 635 F.2d 999 (2d Cir. 1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981); *United States v. Bronston,* 658 F.2d 920 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

This Court for the foregoing reasons concludes that so much of the motion as is founded on Rule 29(c), F.R.Crim.P. should be denied.

■ It is also contended that plaintiff is entitled to relief in the nature of a new trial, or an arrest of judgment by reason of claimed *Brady* violations by the Government.

Two instances are cited. The first has to do with one Angelo Olivieri, the "chief bouncer" of the "Funhouse." It will be recalled that the "Funhouse" was an open and notorious afterhours joint operating in the Chelsea area of this City, which was engaged in the purveying of liquor without a license. It was the Government's theory that Peteroy, defendant and other police officers were receiving cash payments from Mr. Olivieri for purposes of overlooking parking violations by customers of the Funhouse, or assaults inflicted upon customers by the Funhouse bouncers in the normal discharge of their duties, and for maintaining a police presence in the area to deter possible misconduct of patrons and others. Implicitly, although the Government did not so argue, it was also the intention of the Funhouse that its illegal, but open and notorious operations, continue to be free from police interference.

Neither side called Olivieri as a witness. At most his testimony at trial could have corroborated or contradicted Peteroy with respect to his receipt of payoffs from the Funhouse. It was never asserted by Peteroy or the Government that defendant Larson received money from Olivieri or from Peteroy when Olivieri was present. According to Peteroy, Larson received half the money from Peteroy later, and not in the presence of any third party.

As is usual in criminal trials, instead of arguing the weight or significance of the evidence adduced or the lack thereof, the old, "missing witness" red herring argument was dragged out in its full glory by defendant in summation. In response to this missing witness argument the Government argued to the jury that each side had the power of subpoena. This Court then gave the usual instruction concerning the "missing witness". At some point our judicial system should understand that a jury ought to be told simply to decide the case on the evidence or lack of evidence, in light of the presumption of innocence, and forget about what witnesses not called might have said.

It is now claimed that there was a *Brady* violation, because after the conviction defendant's attorney had a conversation with Olivieri's attorney to the effect that if called Olivieri would have exercised his privilege under the Fifth Amendment. It is claimed now that the response by the Government in rebuttal summation, which observed that while the burden of proof remained at all times with the Government, defendant also had the power to subpoena Olivieri, was somehow improper because at the time he made the argument the prosecutor knew Olivieri if called would take the Fifth.

Availability of a witness is a question wholly apart from whether or not that witness, if subpoenaed and questioned, is likely to assert the privilege, or whether, if he does so, the Court is likely to sustain the privilege and/or require the Government to grant immunity. It is not a *Brady* violation to fail to tell defense counsel that an accomplice of the defendant is likely to take the Fifth Amendment if called as a witness at trial.

The second claim concerns one Gerald DeGerolamo, one of the owners of the Funhouse, whose grand jury minutes were turned over to defendant as *Brady* material. It is claimed that DeGerolamo had told the Government, either before or during the trial, that he did not know Kenneth Larson, never gave Kenneth Larson any money, never approved the giving of money to a Kenneth Larson, and never authorized the giving of money to any police officer.

The Government never contended at trial or otherwise that DeGerolamo knew Larson or gave Larson money; all money was given to Peteroy, who shared it with whatever partner in the RMP car worked on that night. On twelve occasions Larson was the partner of Peteroy. In fact, DeGerolamo in pre-trial interviews with the Government did identify Peteroy as an officer he had seen at the Funhouse, and apparently told

the Government that he had seen another police officer sitting in the RMP car with Peteroy on various occasions in front of the Funhouse. DeGerolamo had said, according to the Government, that he "might" be able to make an in-court identification of Mr. Larson at trial. Upon being so informed, this Court ordered that a line-up be conducted prior to any such in-court identification, under the supervision of a Magistrate. Then the Government indicated an intention not to call DeGerolamo. No line-up was held.

It was not essential to the Government's case to prove whether or not DeGerolamo "authorized" the payments made by Olivieri. Indeed the proof showed that Olivieri also had an independent business of his own, a food vendor's truck, conveniently parked in front of the Funhouse.

In light of the aiding and abetting theory under which the case was tried, the alleged exculpatory information from DeGerolamo was not material, since it was never claimed that DeGerolamo *did* know Larson, and most of Peteroy's dealings, including all of them which occurred in Larson's presence, were with Olivieri.

The identity and capacity of DeGerolamo were well-known to defense counsel before trial as a result of disclosures ordered by the Court. Defense counsel had ample opportunity to interview DeGerolamo and ask him whether he had ever authorized the giving of money to any police officer, and if the answer were negative, whether or not he would so testify. The *Brady* rule, as modified by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), does not require the Government to do defense counsel's pre-trial preparation, nor develop a defense strategy, nor does it require the Government to point out the obvious.

Defendant's motions are denied.

So Ordered.