**Hubert Park BECK, Dorothy Fahs Beck, Robert J. Beck and Otto Weinmann, Plaintiffs,**

v.

**MANUFACTURERS HANOVER TRUST COMPANY; Milbank, Tweed, Hadley & McCloy; Kelley Drye & Warren; Donald B. Herterich; Isaac Shapiro; and Edward Roberts, III, Defendants.**

No. 85 Civ. 9361 (RWS).

United States District Court,
S.D. New York.

Sept. 30, 1986.

Stuart Hecker, New York City, for plaintiffs.

Milbank, Tweed, Hadley & McCloy, Kelley Drye & Warren, New York City, for defendants; Kelley A. Cornish, Adlai S. Hardin, Jr., of counsel.

SWEET, District Judge.

In this action brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, defendants move to dismiss the amended complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and to plead fraud with particularity under Fed.R.Civ.P. 9(b) and because the action is barred by the applicable statute of limitations. In addition, defendants move to recover costs and attorneys' fees pursuant to Fed.R.Civ.P. 11 and 28 U.S.C. § 1927. For the following reasons the motion to dismiss is granted, and the motion to recover costs and fees is denied.

**Facts**

In 1902, the National Railroad Company of Mexico ("National") issued $23,000,000 principal amount 4½% Prior Lien Bonds (the "Prior Lien Bonds") and $27,289,000 First Consolidated Mortgage Bonds (the "Consolidated Mortgage Bonds"). Plaintiffs purportedly hold $1,500 principal amount of Prior Lien Bonds and $153,500 of Consolidated Mortgage bonds. Defendant Manufacturers Hanover Trust Company ("MHT") is the successor trustee for both series of bonds. The other defendants are Donald B. Herterich ("Herterich"), a senior vice-president of MHT; Kelley Drye and Warren ("Kelley Drye"), counsel to MHT; Edward Roberts III ("Roberts"), a Kelley Drye partner; Milbank, Tweed, Hadley & McCloy ("Milbank"), counsel to Mexico; and Isaac Shapiro ("Shapiro"), a Milbank partner at the time of the events alleged.

National is a Utah corporation which in 1902 owned and operated railway lines in Mexico. National also owned certain railway properties in and around Laredo, Texas (the "U.S. collateral"), which it pledged to the trustee as security for, among other issues, the Prior Lien and Consolidated Mortgage Bonds. The Prior Lien Bonds represented a first mortgage against the U.S. collateral and certain collateral located in Mexico; the Consolidated Mortgage Bonds were subordinated to the Prior Lien bonds.

In 1908, under a plan of readjustment and union, National was taken over by Ferrocarriles Nacionales de Mexico ("Ferrocarriles"), a publicly-owned corporation which owns and operates Mexico's railroads. As a result, Ferrocarriles assumed all of National's liabilities, as well as ownership of National's property, including the U.S. collateral securing the bonds.

The bonds have been in default since 1914. In 1942, Mexico issued a decree ("the Registration Decree") requiring holders of certain Mexican securities, including the Prior Lien and Consolidated Mortgage Bonds, to present their bonds for registration to establish non-enemy ownership. In 1951, Mexico promulgated the "Law on the Fate of Enemy Bonds" under which ownership of all bonds not registered was deemed to be vested as property of Mexico.

Approximately 96% of the issued and outstanding Prior Lien and Consolidated Mortgage Bonds were registered under the Registration Decree. The bonds held by plaintiffs were never registered. Pursuant to a 1946 Debt Readjustment Agreement with the International Committee of Bankers, or through direct purchases from bondholders, Mexico acquired all Prior Lien and Consolidated Mortgage Bonds registered under the Registration Decree.

Between 1942 and 1981, MHT, as indenture trustee, made numerous distributions of accrued and unpaid interest to holders of Prior Lien Bonds. In these and all other distributions, MHT treated the holders of unregistered bonds (including plaintiffs) as the legal owners of the bonds entitled to receive distributions and treated Mexico as the owner of the approximately 96% of the bonds which Mexico had acquired, notwithstanding plaintiffs' objections that Mexico was not entitled to receive distributions as a bondholder.

MHT read Article Four, Section Five of the Prior Lien Trust Indenture to empower a holder of more than 75% of the issued and outstanding Prior Lien Bonds to instruct MHT to foreclose the Prior Lien Mortgage and sell the collateral securing

the bonds. Mexico, as holder of approximately 96% of the Prior Lien Bonds, directed MHT to foreclose on the mortgage and sell the U.S. collateral.

The collateral was sold at public auction in Laredo, Texas on November 2, 1982 to Mexrail, Inc. for the upset price of $31 million. Mexrail, Inc. was the only bidder. The closing for the sale of collateral took place on November 29, 1982. In December, 1982, MHT published and mailed to known bondholders a notice stating that it would distribute, upon presentment of Prior Lien Bonds, $1,355 of accrued and unpaid interest on each $1,000 Prior Lien Bond from the proceeds of the sale of the collateral.

The claims asserted in plaintiffs' complaint are based on alleged wrongdoing in connection with the distribution of interest payments to Mexico between 1942 and 1981 ("Phase I"), the sale of the U.S. collateral ("Phase II"), and the disposition of the proceeds of that sale ("Phase III"). In Phase I, defendants allegedly defrauded plaintiffs and similarly situated holders of Prior Lien Bonds by unlawfully treating Mexico as a holder of those bonds with respect to seven distributions of accrued interest from April 1, 1972 through December 31, 1981. Through this treatment defendants allegedly wrongfully permitted more than ninety percent of each such distribution to be siphoned off to Mexico, to the detriment of plaintiffs and other individual holders of Prior Lien Bonds.

In Phase II, defendants allegedly defrauded plaintiffs and similarly situated holders of both series of bonds by depriving them of substantially the entire value of the collateral held by MHT as indenture trustee through (a) the sale of the collateral at a fraudulently low price, and (b) the treatment of Mexico as a bond holder entitled to 95.83% of the fraudulently low proceeds of the sale.

In Phase III defendants allegedly defrauded the government and people of Mexico by depriving them of their purported share of the proceeds of the sale of collateral through (a) the sale of the collateral at a fraudulently low price; (b) the

failure to disclose to the government of Mexico that it was being defrauded by corrupt Mexican nationals, some of whom were government officials, and that Mexico could have appeared at the sale and purchased the collateral for little or no cash outlay; and (c) the acceptance by MHT of a fraudulent and legally ineffective assignment from the purchaser, in payment of 95.83% of the sale price, given without consideration of Prior Lien Bonds previously recognized by MHT as validly held by Mexico.

Two prior actions based on these facts are now pending against MHT in the Supreme Court of New York County, *Beck v. Manufacturers Hanover Trust Co.,* No. 12896/83 ("*Beck I*"), and *Beck v. Manufacturers Hanover Trust Co.,* No. 15145/85 ("*Beck II*"). In *Beck I,* plaintiffs allege that MHT breached its fiduciary responsibilities to plaintiffs as bondholders in its administration of the indenture trust. In *Beck II,* plaintiffs allege that MHT breached its fiduciary responsibilities to plaintiffs as bondholders in the conduct of its defense in *Beck I.*

### Statute of Limitations

The provisions of RICO providing for a private cause of action contain no statute of limitations within which actions must be commenced. In the absence of a specific limitations period in a federal statute creating a private right of action, such as the RICO statute, a court must apply the most appropriate relevant federal statute of limitations, and if there is none, the most relevant state limitations period. *Durante Bros. & Sons, Inc. v. Flushing National Bank,* 755 F.2d 239, 248 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3530 (1985); *see also Board of Regents v. Tomanio,* 446 U.S. 478, 485, 100 S.Ct. 1790, 1795, 64 L.Ed.2d 440 (1980); *Johnson v. Railway Express Agency Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). In a RICO action, state law regarding the length of the limitations period applies. *Durante Bros. & Sons, Inc. v. Flushing National Bank, supra,* 755 F.2d at 248.

Because there is no New York state law analogous to RICO, the Second Circuit has held that the three-year statute of limitations in CPLR § 214(2) for liabilities created by statute applies. *Durante Bros. & Sons, Inc. v. Flushing National Bank, supra,* 755 F.2d at 245; *see also Rand v. Anaconda-Ericsson, Inc.,* 623 F.Supp. 176, 182 n. 2 (E.D.N.Y.1985) (assumes that three-year statute of limitations in CPLR § 214(3) [sic] applies to RICO actions involving fraud), *aff'd,* 794 F.2d 843. (2d Cir.1986); *Teltronics Services, Inc. v. Anaconda-Ericsson, Inc.,* 587 F.Supp. 724, 733 (E.D.N.Y.1984) (applies three-year limitations period to RICO action based on fraud), *aff'd,* 762 F.2d 185 (2d Cir.1985). But *see Fustok v. Conticommodity Services, Inc.,* 618 F.Supp. 1076, 1081 (S.D.N.Y. 1985) (In view of perceived ambiguity in *Durante* and practical consideration that case was ready for trial and dismissal would be inefficient, court applies six-year statute of limitations in RICO action grounded in fraud).

▇ While New York state law determines the length of the limitations period under RICO, federal law determines when a RICO cause of action accrues. *See Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir.1979); *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980); *Seawell v. Miller Brewing Co.,* 576 F.Supp. 424, 427–28 (M.D.N.C.1983). Federal law dictates that a cause of action involving fraud accrues "when the plaintiff has actual knowledge of the alleged fraud or knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *ITT v. Cornfeld, supra,* 619 F.2d at 929. Courts uniformly have applied the general federal rule for accrual of RICO claims grounded in fraud. *See Compton v. Ide,* 732 F.2d 1429, 1433 (9th Cir.1984); *Electronic Relays (India) Pvt., Ltd. v. Pascente,* 610 F.Supp. 648, 653 (N.D.Ill. 1985); *Seawell v. Miller Brewing Co., supra,* 576 F.Supp. at 427–28.

This definition of accrual, however, presupposes that the "fraud" includes injury to the plaintiff. "The general federal rule is that the limitations period begins to run when the plaintiff knows or has reason to know of the *injury* which is the basis for this action." *Compton v. Ide, supra,* 732 F.2d at 1433 (emphasis added).

▇ The injury to plaintiffs from the sale of the U.S. collateral occurred on November 29, 1982—the date on which the sale of collateral was closed and title passed from MHT, as trustee, to Mexrail. Prior to the closing no beneficiary of the trust could have maintained an action for damages; the most a beneficiary could have done was attempt to enjoin the sale. This action was instituted on November 29, 1985, exactly three years after the closing. Therefore, the statute of limitations does not bar this action.

## RICO

A private cause of action under RICO is authorized by 18 U.S.C. § 1964(c), which permits any person injured "by reason of" a violation of 18 U.S.C. § 1962 to recover treble damages and attorney's fees. Section 1962 makes it unlawful to (a) invest income "derived ... from a pattern of racketeering activity" in an interstate enterprise, (b) acquire or maintain an enterprise "through a pattern of racketeering," (c) participate in the conduct of an enterprise "through a pattern of racketeering," or (d) conspire to violate any of these substantive prohibitions. A "pattern of racketeering activity" is defined in § 1961(5) to require commission of at least two crimes listed in § 1961(1), including mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

The requirements for pleading a RICO claim were set forth by the Court of Appeals for the Second Circuit in *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984):

[t]o state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as "criminal RICO." In doing so, he must allege the existence

of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976). Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden—i.e., invoking RICO's civil remedies of treble damages, attorney's fees and costs [citations omitted]. To satisfy this latter burden, plaintiff must allege that he was "injured in his business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (1976) (emphasis added). *Accord Sedima, S.P.R.L. v. Imrex Co.,* ―― U.S. ――, 105 S.Ct. 3275, 3285–6, 87 L.Ed.2d 346 (1985); *Rush v. Oppenheimer & Co.,* 628 F.Supp. 1188, 1192 (S.D.N.Y. 1985). Plaintiffs allege multiple violations of RICO under subsections (a), (b), (c), and (d) of section 1962 against multiple defendants in varying combinations and scenarios.

**"Racketeering Activity"**

To be liable under RICO, a defendant must engage in a pattern of racketeering activity. 18 U.S.C. § 1962(a)–(d). "Racketeering activity" is the violation of one or more enumerated state and federal criminal offenses, including mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. 18 U.S.C. § 1961(1).

■ Plaintiffs rely entirely on allegations of mail and wire fraud to make out the requisite "pattern of racketeering activity" under RICO in each of the ten counts of the amended complaint. Therefore, to sustain this action under RICO, plaintiffs must plead the elements of an indictable offense under the federal mail and wire fraud statutes by showing that each de-

fendant (1) participated in a scheme to defraud, and (2) knowingly used the mails or interstate wires to further the scheme. *E.g., United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983).

■ Furthermore, to prove mail or wire fraud, plaintiffs must show that the scheme was devised with specific intent to defraud, that any nondisclosures or affirmative misrepresentations were material, and, although the scheme's victims need not have in fact been defrauded, that some actual harm or injury was at least contemplated. *United States v. Bronston,* 658 F.2d 920, 927 (2d Cir.1981) (citing *United States v. Von Barta,* 635 F.2d 999, 1005 n. 24, 1006 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981)), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). In addition, the statutes are violated when a fiduciary conceals "material information which he is under a duty to disclose to another under circumstances where the non-disclosure could or does result in harm to the other." *United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *see United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983).[1]

■ Plaintiffs need not allege that they were personally defrauded by defendants; rather, they need only allege that they were injured by reason of a scheme to defraud. *See, e.g., SJ Advanced Technology & Mfg. Corp. v. Junkunc,* 627 F.Supp. 572, 575–76 (N.D.Ill.1986); *Callan v. State Chemical Mfg. Co.,* 584 F.Supp. 619, 623 (E.D.Pa.1984). Therefore, plaintiffs are not precluded from bringing this action by reason of certain letters from MHT to plaintiffs disclosing its position in administering the Prior Lien Trust or by reason of other knowledge of MHT's activities. De-

---

**1.** Although raised in the pleadings, the issue of whether RICO incorporates the elements of common law fraud is not determinative here. While the Second Circuit has not specifically discussed the inclusion of common law fraud in mail and wire fraud cases, the specific require-

ment of a showing of materiality in *Bronston* carries with it some showing of possible reliance. *See Bronston,* 658 F.2d at 926 (statutes violated "where the non-disclosure *could* or *does* result in harm") (emphasis added).

fendants contend, however, that plaintiffs have failed to allege the fraudulent or deceptive nature of any act or omission by defendants.

Plaintiffs' complaint alleges a number of misstatements and omissions which it contends were made to defraud (a) the bondholders, other than plaintiffs, who did not tender their bonds in accordance with the 1946 Agreement (the non-assenting bondholders) and (b) Mexico. Plaintiffs allege that the notices mailed and published in connection with the seven interim interest distributions[2] were fraudulent because they implied, falsely, that MHT was a party to the 1946 Agreement and was obligated to distribute interest to the Fiscal Agent of Mexico rather than the non-assenting bondholders. In fact, plaintiffs claim MHT was distributing interest to Mexico as a bondholder rather than under the 1946 Agreement.

The allegation that MHT relied on Mexico's status as a bondholder in making the distributions must be taken as true for purposes of this motion to dismiss the complaint. *See Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). While the notice clearly states instead that MHT was distributing interest payments "in accordance with the Assignments provided for in Article IX of [the 1946] Agreement," such a misrepresentation is immaterial as a matter of law. All bondholders were fully apprised of the distribution of interest to Mexico or the Fiscal Agent of Mexico, and so no misapprehension as to whom the payments were ultimately being made could have arisen. MHT's inconsistent justifications for making the payments to Mexico could not have induced bondholders to act or refrain from acting, since the only action they might have taken was a lawsuit no different from one they could have brought upon discovery of the "fraud." Furthermore, the bondholders could have simply read the 1946 Agreement for themselves to discover whether MHT could legitimately rely on that document in making the payments. *Cf. Samuelson v. Union Carbide Corp.,* No. 85 Civ. 5373, slip op. at 8 (S.D.N.Y. Jan. 29, 1986) [Available on WESTLAW, DCTU database] (under New York law, party will not be heard to complain where he has "the means available to him of knowing, by the exercise of ordinary intelligence ... the real quality of the subject of the representation") (quoting *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597 (1959)) From the face of the complaint it is evident that plaintiffs cannot show that the misrepresentation "could or [did] result in harm" to the non-assenting bondholders. *See United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982).

The remaining claims of fraud arise out of the alleged improper sale of the U.S. collateral. The amended complaint alleges that (1) MHT intentionally misread Article 4, § 5 of the Prior Lien Bond indenture to empower a holder of 75% or more in principal amount of the Prior Lien Bonds to direct a sale and procure its own valuations of the collateral, *see* Amended Complaint ¶¶ 67–80; (2) MHT used the valuations to set the upset price for the sale, ¶ 82, despite the fact that it and the other defendants knew that the valuation of the owned land was only a fraction of its true worth, ¶ 89; (3) Shapiro discussed by telephone the valuations of certain items of collateral without disclosing that each of the valuations substantially understated the value of the property, ¶ 101–103; (4) the Notice of

**2.** Each of the notices contained the following statement:

> In respect of Bonds which have been stamped to indicate assent to the Offer of the United States of Mexico made pursuant to Mexico's Agreement with the International Committee of Bankers on Mexico dated February 20, 1946, the amount of such distribu-

tion will be paid to the Chase Manhattan Bank, Successor Fiscal Agent of Mexico, in accordance with the assignments provided for in Article IX of said Agreement; *and distribution will not be made to the holders of such assenting Bonds.* (Emphasis in original of mailed notices only.)

Sale prepared by defendant (a) failed to inform the Consolidated Mortgage Bond holders of their interest in the sale, ¶ 109(i) & (ii), (b) set forth a sum due on the Prior Lien Bonds that was less than half the sum actually owing on them, ¶ 109 (III), and (c) failed to disclose that the upset price was based on valuations procured by the Mexican nationals; (5) a notice sent to Prior Lien Bondholders on December 20, 1985 and published by newspaper (a) failed to disclose that the sale price was based on fraudulently understated values of the collateral, (b) stated that the amount of the distribution on the assenting bonds was being made to Chase Manhattan as Fiscal Agent when in fact there was to be no such distribution, and (c) failed to disclose that MHT knew that Mexrail's tender of the bonds was fraudulent, ¶ 118–123; and (6) defendants, particularly Milbank and Shapiro, fraudulently failed to inform Mexico that it could have bid at the sale and received a credit against the sale price that would have resulted in it having only a fraction of the price to pay in cash. ¶¶ 128–166.

On the pleadings alone, this court cannot conclude that none of these allegations of misrepresentation and nondisclosure state a claim of fraud as required by Fed.R. Civ.P. 12(b)(6). The materiality of the statements and the actual knowledge of the victims of the alleged fraud are issues whose resolution requires more evidence. Nevertheless, these allegations do not withstand a motion to dismiss under Fed.R. Civ.P. 9(b).

Rule 9(b) requires that "all averments of fraud ... shall be stated with particularity." To satisfy Rule 9(b), the complaint must specify:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and

(2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same,

(3) the content of such statements and the manner in which they misled the [victim], and

(4) what the defendants "obtained as a consequence of the fraud."

*Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167, 1172 (S.D.N.Y.1985) (quoting *Todd v. Oppenheimer &/Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)). Plaintiffs' complaint is detailed enough to satisfy the above requirements.[3]

In addition, although Rule 9(b) provides that intent and "other condition of mind" may be averred generally, plaintiffs must "provide some factual basis for conclusory allegations as to state of mind." *Soper v. Simmons Int'l, Ltd.,* 632 F.Supp. 244, 249 (S.D.N.Y.1986) (Sand, J.); *see e.g., Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Crystal v. Foy,* 562 F.Supp. 422, 426 (S.D. N.Y.1983) (dismissing complaint on grounds that allegations "provide no basis from which a fair and reasonable inference may be drawn of manipulative and fraudulent conduct") (Weinfeld, J.); *River Plate Reinsurance Co. v. Jay-Mar Group, Ltd.,* 588 F.Supp. 23, 26 (S.D.N.Y.1984). While plaintiffs have laid out in detail the alleged misrepresentations and nondisclosures, they have not stated facts that support their claim that defendants' acts, in essence alleged breaches of fiduciary duty, were

---

**3.** The memoranda of law raise the question of whether the latter requirement is narrowly what was *obtained* as a consequence of the fraud or, more broadly, "what was obtained or given up as a consequence of the fraud." 2A J. Moore & J. Lucas, 9–20 through 9–24 (1984). The complaint clearly sets out the victims' alleged loss from a lower sales price.

Whether the plaintiffs must allege that defendants, rather than third parties, benefitted from the fraudulent scheme is a question of substantive law rather than a pleading rule. While trustee's commissions and attorney's fees, funds which presumably would have been received by defendants regardless of any fraud on their part, would hardly seem to be "income derived, directly or indirectly, from a pattern of racketeering activity" within the meaning of § 1962(a), it is unnecessary to reach that question here. It will be assumed that the allegations of the victims' losses satisfies Rule 9(b).

done with the requisite scienter. Plaintiffs' recital of the allegations of the Amended Complaint, *see* Memorandum of Plaintiffs in Opposition to Motion to Dismiss, at 41–45, emphasizes the lack of factual basis for allegations as to state of mind. The facts alleged point to a breach of fiduciary duty rather than fraud. Defendants' only gain was attorneys' and trustees' fees, sums not alleged to be higher than the amounts the defendants would have received absent the alleged fraud. The complaint alleges no facts to provide a reason why the defendants intended to defraud their victims at no benefit to themselves.

## "Pattern of Racketeering Activity"

An alternative basis for dismissal of the complaint is plaintiffs' failure to adequately plead a "pattern of racketeering activity." RICO requires not only that a defendant engage in "racketeering activity," but that its commission of racketeering offenses comprise a "pattern." 18 U.S.C. § 1962(a)–(d). The statute defines "pattern" as requiring at least two of the enumerated predicate acts within a ten-year period. 18 U.S.C. § 1961(5).

In *Sedima, S.P.R.L. v. Imrex Co.*, —— U.S. ——, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the Supreme Court indicated that two acts are necessary but not sufficient to create a "pattern." *Id.* 105 S.Ct. at 3285 n. 14. Noting that "in common parlance two of anything do not generally form a 'pattern,'" the Court construed the term "pattern" to require a relationship and continuity between predicate acts. *Id.* While the relationship between the alleged fraudulent acts is apparent and defendants so concede, the "continuity" requirement is sharply in issue here.

This court and others have consistently held that a defendant who commits various criminal acts in the course of one fraudulent scheme has not committed a "pattern of racketeering" under *Sedima*. "Surely the continuity inherent in the terms presumes repeated criminal *activity*, not merely repeated *acts* to carry out the *same*

criminal activity." *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828, 831 (N.D.Ill.1985). A pattern "must include racketeering acts sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes." *Allington v. Carpenter*, 619 F.Supp. 474 (C.D.Cal.1985). A summary of this court's treatment of the "pattern" element appears in *Richter v. Sudman*, 634 F.Supp. 234 (S.D.N.Y.1986) (Goettel, J.). In *Richter*, the defendants allegedly fraudulently induced the plaintiffs to raise capital over a period of months to be invested in defendants' "Tartufo" company, and plaintiffs deposited the funds in an escrow account to be withdrawn only after certain conditions were satisfied. Without the knowledge or consent of plaintiffs, defendants withdrew and spent plaintiffs' funds. Plaintiffs brought an action under RICO, alleging four separate fraudulent schemes by defendants: the first inducing plaintiffs to raise capital, the second inducing plaintiffs to deposit the funds in escrow, the third concealing the withdrawal of the money and the fourth involving the expenditure of the money. In dismissing the action for failure to plead a "pattern," the *Richter* court articulated several narrow litmus tests for determining whether a "pattern" was alleged, none of which plaintiffs have satisfied here.

First, the court noted that the plaintiffs' articulation of four allegedly separate fraudulent schemes was not enough because "[a]lthough the specific actions underlying each alleged fraud varies, each served a common end, raising money for Tartufo without apparent regard for the interests of potential investors." *See also Crummere v. Brown*, No. 85 Civ. 1376, slip op. at 9 (S.D.N.Y. Apr. 3, 1986) [Available on WESTLAW, DCTU database] ("[t]he mere fact that [defendants'] alleged fraudulent obtaining of the funds occurred in steps rather than in the securing of a single check comprising the entire amount cannot convert this lone fraudulent scheme into different criminal episodes"); *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986) (Although defendants committed

numerous predicate acts over a period of years in fraudulently converting gas from plaintiff's pipeline, no "pattern" was established because defendants' actions "comprised one continuing scheme"); *Soper v. Simmons Int'l, Ltd.*, 632 F.Supp. 244, 254 (S.D.N.Y.1986) (in suit alleging a fraudulent scheme to deprive plaintiffs of commissions in connection with their arrangement of a joint venture agreement between defendants, the court held that defendants' "ministerial acts performed in the execution of a single [allegedly] fraudulent scheme" did not establish a pattern of racketeering activity); *Modern Settings, Inc. v. Prudential-Bache Securities, Inc.*, 629 F.Supp. 860 (S.D.N.Y.1986) (despite the fact that defendants' alleged fraudulent liquidation of plaintiff's securities holdings involved "multiple sales," "each is but a part of a single transaction" and "[t]here is no pattern of racketeering activity in the liquidation alone"); *Professional Assets Management, Inc. v. Penn Square Bank, N.A.*, 616 F.Supp. 1418 (W.D.Okla.1985) (although many actions went into the preparation and issuance of an allegedly fraudulent audit report, it was a "single, unified transaction" and did not constitute a "pattern"); *Morgan v. Bank of Waukegan*, 615 F.Supp. 836, 838 (N.D.Ill.1985) (allegations that sale of a 20% interest in a "venture" was part of a plot to deprive plaintiffs of their investment and other property pleaded only a "single plot, though spread over several years from its hatching in 1978 to its fruition in 1982" and was insufficient to constitute a pattern).

■ Similarly, in the instant action, plaintiffs cannot sidestep the "pattern" requirement by alleging the existence of "two completely different overlapping schemes, the first to defraud the holders of non-assenting bonds (Phase II) and the second to defraud Mexico (Phase III)." The remaining claims of fraud, *see supra*, all involve selling the U.S. collateral for a fraudulently low price—a single transaction.

Moreover, the *Richter* court held that a "pattern" was not established because

"there [is no] evidence that this particular scheme is on-going or continuous. Once the defendants dispose of the investors' funds, the fraudulent scheme comes to an end." *Richter v. Sudman, supra; accord Frankart Distributors, Inc. v. RMR Advertising, Inc.*, 632 F.Supp. 1198, 1201 (S.D.N.Y.1986) ("There is a distinct and easily defined beginning and end to the transaction at issue here, and all of the alleged predicate offenses ... are merely part of this single transaction."); *Furman v. Cirrito*, No. 82 Civ. 4428 (S.D.N.Y. Mar. 12, 1986) [Available on WESTLAW, DCTU database] ("There is no allegation ... that this scheme was ongoing. To the contrary, it was time-limited; when the sale was completed, the scheme came to an end."); *Kredietbank, N.V. v. Joyce Morris, Inc.*, No. 84–1903 (D.N.J. Oct. 11, 1985) ("A single matter under litigation is necessarily finite and circumscribed rather than open-ended and potentially on-going ... [T]he end of the litigation will spell the limit of the enterprises' fraudulent scheme."). Similarly, in this case, plaintiffs have not pleaded a "pattern" because defendants' alleged fraudulent conduct is not on-going or open-ended—it allegedly began with MHT's intentional misreading of the Prior Lien Bond indenture to empower Mexico to order a sale of the U.S. collateral and, most significantly, ended with the sale of the collateral and distribution of the proceeds of the sale.

Furthermore, this court, in *Richter* and other cases, also has required a showing that the defendant has a history of involvement in conduct similar to that alleged in the complaint. *Richter v. Sudman, supra* ("The plaintiffs have not alleged that the defendants have engaged in similar schemes to defraud other investors ..."); *Furman v. Cirrito*, No. 82 Civ. 4428 (S.D.N.Y. Mar. 12, 1986) [Available on WESTLAW, DCTU database] ("There is no allegation that defendants were involved in other such episodes ..."); *Kredietbank, N.V. v. Joyce Morris, Inc.*, No. 84–1903 (D.N.J. Oct. 11, 1985) ("the fact that an enterprise makes it a practice to submit false affidavits in lawsuits in general [rath-

er than in a single lawsuit] ... might well indicate a pattern of unlawful activity"); *Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986) ("There was no proof that [defendants] ha[ve] ever done these activities in the past ... [or] were engaged in other criminal activities elsewhere."); *Fleet Management Systems, Inc. v. Archer-Daniels-Midland Co.*, 627 F.Supp. 550 (C.D.Ill.1986) (allegations of mail and wire fraud violations in furtherance of a scheme to misappropriate plaintiff's computerized system for routing trucks failed to plead a "pattern" because this "isolated criminal episode" presented no "threat of continuing criminal activity").

Plaintiffs have not met the standards articulated by this court for pleading a "pattern" of racketeering activity. Accordingly, the Amended Complaint is dismissed.

Since the Amended Complaint sets forth colorable claims under RICO, *see Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985), defendants' motion for sanctions under Fed.R.Civ.P. 11 and 28 U.S.C. § 1927 is denied.

IT IS SO ORDERED.