**BANGKOK CRAFTS CORPORATION, Plaintiff/Counterclaim Defendant,**

v.

**CAPITOLO DI SAN PIETRO IN VATICANO, Defendant/Counterclaimant.**

**Capitolo di San Pietro in Vaticano, Defendant/Counterclaimant,**

v.

**Treasures of St. Peter's in the Vatican Ltd., et al., Additional Counterclaim Defendants.**

**E–21 Global, Inc., Craig Franco, New Renaissance Art, Inc., and Maxx International, Inc., Counterclaim Defendants/Third–Party Plaintiffs,**

v.

**John Loata, Gerald P. Colapinto, Second Renaissance, LLC, and Terry E. May, Third–Party Defendants.**

No. 03 Civ. 0015(RWS).

United States District Court,
S.D. New York.

Aug. 23, 2004.

---

248

Rosenblith & Flynn, New York, NY by Robert M. Rosenblith, for Third–Party Defendants Gerald P. Colapinto and Second Renaissance, LLC.

Meringolo & Associates, P.C., Brooklyn, NY by John C. Meringolo, for Counterclaim Defendants/Third–Party Plaintiffs.

## OPINION

SWEET, District Judge.

Third-party defendants Gerald P. Colapinto ("Colapinto") and Second Renaissance, LLC ("SRLLC") have moved pursuant to Fed.R.Civ.P. 9(b) and Fed. R.Civ.P. 12(b)(6) to dismiss Counts One (fraud), Two (unfair competition), Four (unjust enrichment), and an unenumerated claim styled "Third Party Complaint/Cross Claim" sounding in fraud of the third-party complaint filed by third-party plaintiffs E–21 Global, Inc. ("E–21"), Craig Franco ("Franco"), New Renaissance Art, Inc. ("New Renaissance"), and Maxx International, Inc. ("Maxx"). For the reasons set forth below, the motion is granted in part and denied in part.

### Prior Proceedings

Plaintiff and counterclaim defendant Bangkok Crafts Corporation ("BCC") commenced this action in the Supreme Court of the State of New York, County of New York on August 7, 2002, alleging claims of breach of contract, fraud, conversion and unjust enrichment against defendant coun-

terclaimant Capitolo di San Pietro in Vaticano ("Capitolo"). The action was removed to this Court on January 2, 2003.

Capitolo asserted counterclaims and joined additional counterclaim defendants Treasures of St. Peters in the Vatican, Ltd. ("TSV"), John Loata ("Loata"), E–21, Franco, New Renaissance and Maxx on March 31, 2003. In turn, on November 26, 2003, E–21, Franco, New Renaissance and Maxx filed their third-party complaint against Colapinto and SRLLC, Terry May ("May") and TMI, LLC ("TMI").

On June 23 2004, this Court granted partial summary judgment to the Capitolo on its counterclaims against BCC. *See Bangkok Craft Corp. v. Capitolo di San Pietro in Vaticano,* No. 03 Civ. 0015, 2004 WL 1406076 (S.D.N.Y. June 23, 2004). In the decision, it was found that the signatures on the License allegedly entered into between the Capitolo and BCC on August 28, 2000 were "forged, thus rendering the contract void *ab initio." Id.* at *6.

The instant motion was fully submitted on April 14, 2004.

### Background of the Dispute

According to the pleadings, on February 8, 1996 Capitolo granted a license (as amended) to market reproductions of art objects located in the Vatican Treasury Museum and to use the trademarks and copyrights relating to the objects in connection with such exploitation (the "License"). The term of the License was five years with BCC having the option to renew the License for an additional five years and also certain rights to grant sublicenses.

On June 1, 1997, BCC purportedly assigned all of its rights and interests in the License to TSV, an entity owned and controlled by Loata, who was alleged to own BCC.

On August 15, 1997, BCC appointed Colapinto and his daughter, Sandra Nutt ("Nutt"), to act as exclusive manager and sales and marketing representative with regard to the sublicensing of the rights granted to BCC under the License. Colapinto is alleged to be the president and "managing member of SRLLC." Third Party Complaint, ¶ 18.

On February 2, 1999, Franco, a citizen and resident of Utah, entered into a sublicense agreement with TSV, relating to certain coins, medallions and decorative crosses, and paid to TSV an advance royalty of $150,000.

On February 4, 2000, E–21, a New York corporation, entered into a sublicense agreement with TSV for the right to sell and market certain licensed products via the internet, and paid to TSV an advance royalty of $250,000.

On or about May 10, 2000, New Renaissance, a Nevada corporation, entered into a sublicense agreement with TSV for the manufacture and sale of certain sculptures, and paid to SRLLC an advance royalty of $135,000 which SRLLC was to remit to TSV.

In June 2000, Maxx, a Utah corporation, entered into two sublicense agreements with TSV relating to telephones, phone cards, and paid to TSV an advance royalty of $570,000.

According to BCC, on August 28, 2000, Capitolo granted it a new worldwide license governing the Vatican Treasury Museum for a collective term of forty-five years (the "8/28 License") for which BCC paid $580,000.

E–21 alleges that in September 2000, based upon representations by Colapinto and May, it acquired from TMI its interest in a confection sublicense which TMI then held from BCC/TSV, and entered into a revised internet sublicense with TSV replacing the original and seven additional sublicenses governing candles, chocolate

confections, flowers, fund-raising, cards and calendars and stamps, for which E–21 paid TSV an additional $80,000 in advance royalties.

According to BCC, in October 2000, it received an attorney's letter informing it that the 8/28 License was a forgery. According to Capitolo, it informed BCC and Loata that the License would not be extended and as a consequence, a controversy arose between BCC/TSV and Capitolo regarding BCC/TSV's ongoing rights with respect to the Vatican Treasury Museum.

In December 2000, Maxx entered into a mutual release with SRLLC and Colapinto regarding all claims of Maxx arising from or relating to the sublicense agreements referred to above.

### Allegations in Count One

In paragraph 21 of the third-party complaint the following statements are alleged to be false and misleading: BCC/TSV was not in breach or default of the 1996 License; the 1996 License was in good standing; BCC/TSV had a strong relationship with the Capitolo; all obligations imposed on BCC/TSV by the License had been met; major manufacturers such as Echo, Lladro and Waterford were about to sign sublicenses with TSV; the Assignment of the License to TSV had been approved by Capitolo; Colapinto and SRLLC had a very close relationship with representatives of the Capitolo and could obtain images from the Capitolo for product development by the sublicensees; the License had been extended for an additional five years; and the subject matter and scope of each of the sublicenses were approved and authorized by the Capitolo.

In paragraph 30 of the third-party complaint it is alleged that during the period from December 2000 to April 2003 Colapinto repeatedly represented to the sublicensees and their investors, customers and suppliers that the sublicenses were valid and in good standing; that the License was in good standing and had been extended; and that the sublicensees could rely on the validity of their sublicenses in developing and pursuing their respective businesses.

In addition to these statements, Colapinto and SRLLC specifically stated to E–21 in September 2000 that the Capitolo had granted a forty-five year extension of the License, and that the sublicense issued to TMI was binding and in good standing.

Paragraphs 22, 23, and 44 of the third-party complaint allege that Colapinto and SRLLC were aware that the representations were false and misleading when they made them, that prior to the execution of any of the sublicenses, the Capitolo had advised BCC/TSV that they were in breach of the License; that the License was not in good standing; that the License would not be extended; that Colapinto and SRLLC had exaggerated and fabricated the interest that major manufacturers had in the sublicense program; that the assignment to TSV had not been approved by the Capitolo; that Colapinto and SRLLC did not have a close relationship with the Capitolo and could not arrange to secure images for product development; and that Colapinto and SRLLC never submitted the sublicenses to the Capitolo for approval. After December 2000, it is alleged that Colapinto and SRLLC continued to represent that the sublicense had been extended and that the sublicenses were valid and in good standing, even though they had met with representatives of the Capitolo in December 2000 and had been advised that the License had not been extended, that the purported August 28, 2000 extension agreement was a forgery and that the sublicenses were void and invalid.

It is further alleged that the statements were made to the third-party plaintiffs prior to the execution of their respective sub-

license, in their presence during the time that each third-party plaintiff was negotiating with Colapinto and SRLLC for the purchase of the sublicense. From December 2000 through April 2003, Colapinto and SRLLC had numerous conversations with E–21, Franco and New Renaissance or with their potential investors and suppliers wherein Colapinto and SRLLC repeated the false and misleading statements.

The third-party complaint alleges that Colapinto made all of the above-referenced false and misleading statements and that Colapinto was the exclusive sales and marketing representative of BCC with regard to the sublicense rights granted to BCC, and handled all negotiations relating to the issuance of sublicenses to potential sublicensees, that Colapinto was an agent of BCC/TSV, and statements were made by Colapinto in the course of his agency.

After Colapinto had induced the third-party plaintiff to enter into sublicenses, he continued to engage in his fraudulent and misleading conduct by encouraging the sublicensees to spend considerable time, energy and resources in developing their respective businesses, and soliciting investors when he knew that the sublicenses were considered to be void by the Capitolo, and that the August 28, 2000 agreement had been declared to be a forgery by the Capitolo. It is also alleged that in order to forestall E–21 and the other sublicensees from discovering the true facts concerning the status of the sublicenses, Colapinto arranged for a payment moratorium on E–21's advance royalty payments and that even though Colapinto knew that the sublicenses were considered to be void, and that the August 28, 2000 agreement had been declared to be a forgery, Colapinto still attempted to extract money from E–21 by asserting that he could place its sublicenses into an inactive status for a fee of $100,000. Colapinto is alleged to have misappropriated the $135,000 paid by New Renaissance for its sublicense and misused E–21's business plan, marketing plan and business valuation analysis for his own benefit.

### Allegations of Count Two (Unfair Competition)

By Colapinto negotiating contracts deceitfully, with bad intent and bad faith, it is alleged that the third-party plaintiffs subsequently lost millions of dollars while defendants received at least $400,000 in commission.

On August 15, 1997, it is alleged that a contract was executed between Loata, Colapinto and Nutt to enable Colapinto serve as the exclusive management, sales and marketing representative for the BCC's license except for jewelry, watches and holograms, and that the August 15, 1997 contract permitted Colapinto and Loata of BCC to collect over $1,000,000 with respect to the advance royalty payments from all third-party plaintiffs, and to sell sublicenses to the Vatican Treasurer of Saint Peters at a 40% cash commission.

It is alleged that Colapinto and SRLLC were unjustly enriched by receiving a 40% commission and 10% of all royalties from each sublicensee pursuant to his August 15, 1997 agreement with BCC, while knowing that BCC/TSV was not in good standing with the Capitolo and that the August 2000 license was a forgery.

Colapinto and SRLLC are alleged to have continued to take payments from the third-party plaintiffs with the knowledge that the License with the Capitolo would not be renewed and that BCC/TSV was not in good standing with the Capitolo and to have failed to notify any of the third-party plaintiffs that there were any general or specific problems with the License and that the August 2000 extension was a forgery between BCC and the Capitolo.

### Motion to Dismiss Standard

In reviewing a 12(b)(6) motion, courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993) (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988). The complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1956); see also *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996).

In determining a motion to dismiss, "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken are considered." *Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir.1993). "A court's task in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence to which might be offered in support thereof.'" *Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101 (2d Cir.2003) (quoting *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998)).

### Rule 9(b) Requires Dismissal Of Count One

■ Under Fed.R.Civ.P. 9(b), "the circumstances constituting fraud ... shall be stated with particularity." However, "malice, intent, knowledge, and other condition of mind may be averred generally." *Id.* "To satisfy Rule 9(b)'s particularity requirement, a plaintiff's complaint must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Flash Electronics, Inc. v. Universal Music & Distribution Corp.*, 312 F.Supp.2d 379, 402 (E.D.N.Y.2004) (quoting *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999)). Included in an explanation of why the statements were fraudulent should be a statement of what "defendants 'obtained' as a result of the fraud." *Morin v. Trupin*, 823 F.Supp. 201, 205 (S.D.N.Y. 1993) (citing *Beck v. Manufacturers Hanover Trust Co.*, 645 F.Supp. 675, 682 (S.D.N.Y.1986), *aff'd*, 820 F.2d 46 (2d Cir. 1987)). "Scienter need not be pled with great specificity, but must be supported by facts giving rise to 'strong inferences' of fraudulent intent." *Id.*

■ The third-party plaintiffs have set forth their claims collectively. There is no separate averment as to each third-party plaintiff of the date, place, circumstances and content of each alleged misrepresentation made to them by Colapinto and SRLLC. Also, the allegations of the third-party complaint do not specify the time and place that each alleged misstatement was made to a particular third-party plaintiff and the factual basis for inferring scienter.

It is alleged that Colapinto made the statements on behalf of SRLLC and in each instance during the negotiations of the sublicenses. The period during which the statements were made and whether or not each statement was made to each third party plaintiff may be inferred but must be stated precisely. Further, since Colapinto and SRLLC are alleged to be agents of BCC and TSV, it must be specified whether liability is asserted against a particular principal.

Scienter, or intent to defraud, which must be pled to establish a fraud claim, may be averred generally. *See* Fed.

R.Civ.P. 9(b). "Allegations supporting an inference of fraudulent intent frequently include defendant's statement that a fact exists or [that] an event will come to pass coupled with allegations that the fact did not exist or the event did not occur, and circumstances indicating that the statement was false when made." *Kimmel v. Labenski*, No. 85 Civ. 0804, 1990 WL 213079, at *2 (S.D.N.Y. Dec.13, 1990). It is alleged that BCC had been in breach of the License since 1999, that the Capitolo had not approved the sublicenses and considered them invalid, that Colapinto could not obtain images for product development, all of which indicated that the statements were false when made and that major manufacturers had not committed to the sublicense program.

■ Colapinto and SRLLC also seek to dismiss the fraud claims based on the existence of a merger clause contained in each of the sublicenses, which provides:

There are no representations, warranties, promises, agreements, or covenants other than those contained herein. This Agreement constitutes the entire agreement between the parties and supersedes any prior agreements or understanding relating to the subject matter thereof.

Third Party Complaint, ¶ 17. Colapinto and SRLLC argue that this clause demonstrates that the third-party plaintiffs may not reasonably rely on any representations allegedly made by them which orally modify the agreements which third-party plaintiffs had with TSV. A merger clause, however, is not a defense to a claim of fraudulent inducement. *See Sabo v. Delman*, 3 N.Y.2d 155, 161, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957) (merger clause does not exclude evidence of fraudulent misrepresentations, for "otherwise, a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the fore-

sight to include a merger clause in the agreement."). Whether it is reasonable for a plaintiff to rely on defendant's fraudulent statement in light of a merger clause involves issues of fact, rather than of pleading. *See CSI Inv. Partners II, L.P. v. Cendant Corp.*, 180 F.Supp.2d 444, 463 (S.D.N.Y.2001). Therefore, a merger clause is not a basis for a motion to dismiss.

Because individuation is required under Rule 9 as to each statement, as to each third-party plaintiff and as to the time of making the statements and the third-party defendant against whom liability is sought to be imposed, Count One is dismissed. By lumping together Loata, Colapinto and SRLLC, it cannot be determined which third-party defendant made what specific statement, when they were made, nor can scienter, reliance and damages be determined, contrary to the requirements of Rule 9(b).

Even if the allegations in Count One had been properly individuated, it would still be dismissed as to Colapinto and SRLLC because the chronology of events alleged does not suggest scienter. The complaint alleges only that the invalidity of the 8/28 License was known by Colapinto and SRLLC "[b]y December 2000 ..." Third Party Complaint ¶ 28. However, four of the seven misrepresentations are alleged to have been made by Colapinto during the course of the negotiations over the sublicenses, the last of which was entered into in June 2000.

Finally, in Count One, the third-party plaintiffs allege conduct by Colapinto and SRLLC regarding the failure to disclose from "... December 2000 through April 2003 ..." certain facts about the status of BCC/TSV's license arrangement with the Capitolo. Assuming the truth of these allegations, no separate claim of fraud is stated as to the sublicenses which each

third-party plaintiff had already entered into with TSV and no attempt is made to plead claims for damages other than those applicable to the making of the sublicense agreements.

### Count Two Of The Third–Party Complaint (Unfair Competition)

Colapinto and SRLLC submit that no claim for relief is stated under Count Two because (1) there is no specific pleading of anti-competitive conduct on their part, and (2) no specific facts are pled from which an inference of bad faith may be based. Finally, no claim for deceptive acts or practices is stated under New York statutory law because such claims are limited to consumer transactions.

 The standard of unfair competition under New York law is a virtual cognate of the federal Lanham Act and is predicated on the theory of the misappropriation of a claimant's commercial goodwill. *See E.R. Squibb & Sons, Inc. v. Cooper Laboratories, Inc.,* 536 F.Supp. 523, 526 (S.D.N.Y.1982) ("The standard for unfair competition under the Lanham Act differs very little from that under the New York law. The essence of both sources of protection is the likelihood that the consuming public will be confused about the source of the allegedly infringing product.") (citing *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 664 (2d Cir.1979)).

Under New York law, "the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." *Eagle Comtronics, Inc. v. Pico Products, Inc.,* 256 A.D.2d 1202, 1203, 682 N.Y.S.2d 505, 506 (4th Dep't 1998). The essence of an unfair competition claim is that one may not misappropriate the results of the labor, skills and expendi-

tures of another, *LinkCo., Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 500 (S.D.N.Y.2002); the tort functions to protect "property rights of value . . . from *any* form of commercial immorality." *Metro. Opera Ass'n v. Wagner–Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 492 (N.Y.1950) (emphasis added), *aff'd,* 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951) (per curiam). New York courts broadly construe this tort: "[t]he incalculable variety of illegal practices denominated as unfair competition is proportionate to the unlimited ingenuity that overreaching entrepreneurs and trade pirates put to use." *Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556, 558, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959) (internal quotation marks and citations omitted).

*Norbrook Laboratories Ltd. v. G.C. Hanford Mfg. Co.,* 297 F.Supp.2d 463, 491 (N.D.N.Y.2003). However, the practices which are prohibited by the tort of unfair competition must relate to *competition* in some form. Not every form of commercial immorality takes the form of the misappropriation of the commercial advantage that belongs to another.

 It was incumbent on third-party plaintiff to at least plead facts describing the goods which Colapinto or SRLLC allegedly misappropriated or marketed to the public, aver the way or ways in which these alleged goods competed with those of each of the third-party plaintiffs, the basis of public confusion and state the damages allegedly resulting to each of the third-party plaintiffs from the alleged anti-competitive activity.

No facts are pled as to Colapinto or SRLLC which support a claim for unfair competition.

 Alternatively, if viewed liberally as a claim for deceptive trade practices,

Count Two similarly fails to state a claim for relief under New York statutory law.

In New York, the law of deceptive trade acts and practices is codified under § 349 of the General Business Law. That statute declares as unlawful "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state ..." Subsection (h) of the statute creates a private cause of action for any person who has been injured by reason of any violation of the act.

■ Section 349, however, is expressly consumer oriented in its application. A claimant relying on § 349 must establish that the alleged deceptive act or practice was directed to the consuming public at large. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). *Accord Stutman v. Chemical Bank*, 95 N.Y.2d 24, 28, 709 N.Y.S.2d 892, 895, 731 N.E.2d 608 (2000) (a plaintiff under Section 349 must establish three elements: that the challenged act or practice was consumer-oriented; that it was misleading in a material way; and that the plaintiff suffered injury as a result of the deceptive act).

As the third-party plaintiffs are commercial entities complaining of alleged private wrongs to them and not to the general public, Count Two of the third-party complaint fails to state a claim for relief against Colapinto and SRLLC.

### Count Four Fails To State A Claim Of Unjust Enrichment

■ "[A] recovery for unjust enrichment is permissible 'when and because the acts of the parties or others have been placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good con-

science he ought not to retain it, and which *ex aequo et bono* belongs to another.'" *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (quoting *Miller v. Schloss*, 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)); *see also Mfrs. Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dept.1990), *appeal denied*, 77 N.Y.2d 803, 568 N.Y.S.2d 15, 569 N.E.2d 874 (1991).

■ Third-party plaintiffs E–21, Franco and Maxx aver that they entered into certain sublicense agreements with TSV pursuant to which they paid advanced royalties to TSV, rather than to Colapinto and SRLLC,[1] and that TSV was unjustly enriched thereby. There is no averment that Colapinto and SRLLC received these advance royalty payments in their own right and for their direct benefit, and therefore there is no basis for any claim of personal gain.

E–21, Franco and Maxx have asserted on information and belief that Loata and Colapinto and SRLLC received commissions or fees out of the advance royalties which were paid to TSV. Even if such commissions were paid to Colapinto and SRLLC, it is not alleged that they were paid by E–21, Franco and Maxx but by TSV. Such an attenuated chain of payment cannot support a claim for unjust enrichment.

### E–21's Third–Party Claim is Dismissed

In paragraphs 77 to 83 of the Third Party Complaint, E–21 alleges an unenumerated claim against Colapinto and SRLLC as well as TMI and May. Although the term fraud is not used, the claim sounds in fraud. E–21 alleges that it was induced to enter an agreement to

---

**1.** Third-party plaintiff New Renaissance does not aver that it paid $135,000 in advance royalties directly to SRLLC, but as collection agent for the purpose of being forwarded to TSV.

acquire May's and TMI's interest in the confection sublicense as a result of misrepresentations by May and Colapinto. However, the claim shares many of the same deficiencies of Count One of the Third Party Complaint: it does not allege the time and place of each material statement, the speaker, the content, the facts supporting an inference of scienter and what Colapinto or SRLLC obtained as a result of the alleged fraud. Accordingly, this claim is also dismissed.

**The Dispute Regarding the Maxx Release Shall Be Determined By Arbitration**

 Colapinto and SRLLC seek partial summary judgment on the claims asserted by Maxx on the basis that Maxx has released Colapinto and SRLLC pursuant to a written agreement of release entered into as of December 2000.

At the same time, Colapinto and SRLLC assert that in the event of a dispute arising out of the release the parties have agreed to resolve any dispute in New York City under the rules of the American Arbitration Association.

Maxx counters that there are genuine issues of material fact which preclude dismissal. The release specifically provides that it is "conditioned upon and subject to the execution and delivery of a credit card sublicense (the "Sublicense") between Second Renaissance, LLC and Maxx . . .", Def.'s Exh. Q, ¶ 3, and was expressly made subject to the execution and delivery of a binding and enforceable sublicense between SRLLC and Maxx. Maxx argues that this condition has not occurred and therefore that the release never became binding.

Paragraph 11.1 of the Release states that "[a]ny dispute arising out of, in connection with, or in relation to this Agreement or the making or validity thereof or its interpretation or any breach thereof shall be determined and settled by arbitration. . . ." The dispute over whether the condition precedent has occurred falls within the scope of this provision. Accordingly, it must be arbitrated in accordance with ¶ 11.1.

Maxx's contention that the Release was fraudulently induced is insufficient to preclude arbitration. Maxx argues that Colapinto fraudulently induced Maxx to sign the release by misrepresenting that the Ufficio Vendita Pubblicazioni e Riproduzioni Dei Musei Vaticani ("UVPR"), one of the entities that must approve a sublicense before the release can take effect, was likely to approve the sublicense. Any alleged misrepresentation by Colapinto is irrelevant because the Release includes Maxx's acknowledgment that "SRLLC has made and makes no representation regarding the likelihood of obtaining the requisite approval of UVPR." *Id.*, Recital F.

**Conclusion**

For the reasons set forth above, Counts One, Two, Four and the unenumerated claim styled "Third Party Complaint/Cross Claim" sounding in fraud are dismissed as to Colapinto and SRLLC. The dispute as to whether the release entered into between Maxx and Colapinto and SRLLC bars all of the claims asserted by Maxx against Colapinto and SRLLC shall be determined by arbitration in accordance with the terms of the release.

It is so ordered.